**E. & J. GALLO WINERY, Plaintiff,**

**v.**

**PASATIEMPOS GALLO, S.A., and Don Clemente, Inc., Defendants.**

**No. CV–F–92–5785–REC.**

United States District Court,
E.D. California.

Sept. 6, 1994.

G. Kip Edwards, Orrick Herrington and Sutcliffe, San Francisco, CA.

D. Gregory Durbin, McCormick Barstow Sheppard Wayte and Carruth, Fresno, CA.

Paul W. Reidl, E. and J. Gallo Winery, Modesto, CA.

Thomas E. Sisson, San Antonio, TX.

Margaret E. Kemp Williams, Dowling Magarian Aaron and Heyman, Fresno, CA.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

COYLE, Chief Judge.

Upon full consideration of the evidence and arguments presented by parties in trial, this Court makes the following findings of fact and conclusions of law:

## I. *FINDINGS OF FACT*

### A. *Background*

F1. E. & J. Gallo Winery ("Winery") brought this action against defendants Pasatiempos Gallo, S.A. ("Pasatiempos") and Don Clemente, Inc. ("DCI") on November 16, 1992, to enjoin defendants' infringement of plaintiff's trademark under the Lanham Act, 15 U.S.C. § 1114 *et seq.* The Winery also makes three claims under California law: trademark infringement (Cal.Bus. & Prof. Code § 14200), trademark dilution (Cal.Bus. & Prof.Code § 14330) and unfair competition (Cal.Bus. & Prof.Code § 17200).

F2. DCI filed its answer on December 18, 1992. Pasatiempos answered on January 8, 1993, asserting the defenses of prior use, laches, and estoppel by acquiescence.

### B. *The Parties*

#### 1. *Gallo Winery*

F3. The Winery is a California corporation with its principal place of business in the Eastern District of California.

F4. The Winery owns a family of trademarks, each having as its dominant or sole element the word "GALLO."

F5. The Winery owns the following trademark registrations on the principal register of the United States Patent and Trademark Office:

| Trademark | Reg. No. | Issue Date | Goods |
|---|---|---|---|
| GALLO | 444,756 | 03–24–53 | Wines |
| ERNEST & JULIO GALLO | 778,837 | 10–20–64 | Wines |
| GALLO | 887,959 | 03–17–70 | Prepared Meat Products and Cheese |
| GALLO | 891,339 | 05–19–70 | Wines and Champagnes |

Each of these marks is incontestable under 15 U.S.C. § 1065.

F6. The Winery owns the following California trademark registrations:

| Trademark | Reg. No. | Issue Date | Goods |
|---|---|---|---|
| GALLO | 28047 | 02–07–46 | Wines |
| GALLO | 43695 | 03–13–64 | Prepared Meat Products and Cheese |
| GALLO | 47678 | 03–19–70 | Wines |

F7. The Winery used the GALLO mark on its first shipment of wine in 1933.

F8. For the first seven years of the Winery's existence, it used the GALLO mark on wine barrels and on tags attached to tank cars. Gallo began using a GALLO mark on bottle labels in 1940.

F9. In 1940, the Winery first used the GALLO mark on wine bottles sold in Los Angeles. It has been in continuous use on wine bottles since then. It took approximately twenty years for the Winery to establish nationwide distribution of the GALLO brand.

F10. The Winery currently distributes GALLO brand wines in the United States through approximately 400 wholesale distrib-

utors. GALLO brand wine is sold in approximately 175,000 retail establishments, including hotels, restaurants, bars, taverns, grocery stores, drug stores, convenience stores, delicatessens, supermarkets, club stores, warehouse stores, and liquor stores.

F11. The Winery first advertised its GALLO mark in 1940 or 1941. Since then, the Winery has advertised throughout the United States via radio, television, billboards, newspapers, magazines, point of sale materials, and other print advertising. By 1952, the Winery was advertising on television, and it has continued to make substantial use of television advertising. The Winery has spent approximately a half billion dollars promoting the GALLO brand in the United States.

F12. In 1946, the Winery applied to register the word "GALLO" under the Trademark Act of 1905. This led to the issuance of currently active United States Registration No. 444,756 in March 1953.

F13. The word "GALLO" has always dominated the Winery's labels. Since the first GALLO label was introduced in Los Angeles in 1940, numerous changes have been made in the style and format of labels using GALLO as a consumer trademark. The Winery has historically made prominent use of a striking rooster profile and red background to accompany its GALLO mark.

F14. Over four billion bottles of GALLO brand wine have been sold in the United States. In the last two years alone, approximately 360,000,000 bottles of GALLO brand wine have been sold to U.S. consumers.

F15. At the time of trial, the Winery used the GALLO mark on six tiers (price brackets) of varietal wines: estate bottled wines; Sonoma tier wines; a "special tier" which includes vintage dated cabernet sauvignon and chardonnay; the "California" tier; the "reserve cellars" tier; and the Gallo Livingston Cellars tier.

F16. New products with the GALLO trademark are readily accorded shelf space by retailers. This is illustrated by the Winery's recent experience with its estate tier wines.

F17. A survey conducted in 1991 showed that 95% of consumers who drink wine and who had heard of the Winery associated the GALLO trademark with wine. Of those consumers who were non-wine drinkers and had heard of the Winery, 91% associated GALLO with wine.

F18. By virtue of widespread sales and promotion for over half a century, the Winery's GALLO mark has become extraordinarily strong and distinctive.

### 2. *Pasatiempos Gallo*

F19. Pasatiempos is a Mexican corporation with its principal place of business in Queretaro, Mexico. It is owned by the Landin family.

F20. The Mexican company, Clemente Jacques ("CJ"), was sold to United Fruit in late 1967 or early 1968. United Fruit then sold Clemente Jacques to Grupo Visa in 1977. Grupo Visa then sold Clemente Jacques, including its subsidiary Pasatiempos, to the Landin family in 1983.

F21. Clemente Jacques never owned any United States trademark registrations for a GALLO mark.

F22. Early use of the word GALLO on packaging by the current and preceding owners of Pasatiempos was minimal. The unadorned word "GALLO" initially appeared on their goods in small typeface and in inconspicuous locations as if to denote a trade name only. The word "GALLO" was sometimes accompanied by a small silhouette of a rooster.

F23. By 1987, the only GALLO-branded product sold by the current owners of Pasatiempos was playing cards. In contrast to earlier goods by Pasatiempos, those playing cards prominently displayed the word "GALLO" mark in a red banner in conspicuous locations. By 1990, Pasatiempos had begun using the GALLO mark in the red banner on other paper products, including poker chips, confetti, party streamers, "loteria" games, and other board games. Also, the prominence and decoration of Pasatiempos's rooster profile grew to become a striking component of Pasatiempos's packaging.

F24. Pasatiempos's gross sales in the United States before 1992 were minimal. Yearly sales prior to the filing of the complaint follow:

| Year | Sales in U.S. $ |
|------|------|
| 1984 | 34,481 |
| 1985 | 27,113 |
| 1986 | 17,938 |
| 1987 | 7,733 |
| 1988 | 15,136 |
| 1989 | 21,962 |
| 1990 | 159,276 |
| 1991 | 40,338 |
| 1992 | 208,954 |

Approximately 80% of defendants' U.S. customers are located in California.

F25. The retail price of Pasatiempos's products varies from $1.50 to $3.50. They are sold in various types of retail outlets and swap meets.

F26. Defendants have never advertised or otherwise promoted products bearing the GALLO mark on television, radio, or in print media. Their sole promotional expense has been the publication of two catalogs for use by salespersons, at an estimated cost of $10,-000.

F27. Pasatiempos owns the following federal trademark registrations containing the word GALLO:

| Trademark | Reg. No. | Issue Date | Goods |
|-----------|----------|-----------|-------|
| GALLO | 1,466,318 | 11–24–87 | Playing Cards |
| GALLO INTRANSPARENTE (and design) | 1,466,319 | 11–24–87 | Playing Cards |
| GALLO (and design) | 1,495,061 | 07–05–88 | Playing Cards |
| GALLO (and design) | 1,515,560 | 12–06–88 | Board Games |

F28. The present lawsuit was filed before the end of the fifth year of each of the registrations. None of these registrations has become incontestable under 15 U.S.C. § 1065.

### 3. *Don Clemente*

F29. DCI is a Texas corporation with its principal place of business in San Antonio, Texas. It was formed in 1984.

F30. DCI is also owned by the Landin family. DCI imports and distributes Pasatiempos's products in the United States.

### C. *Likelihood of Confusion*

F31. Use of GALLO as a consumer trademark on playing cards, Mexican bingo (loteria) games, poker chips, confetti, party streamers, and board games is likely to result in consumers believing that these products are made, endorsed, sponsored or in some way connected with the Winery.

### 1. *Strength of the Winery's Mark*

F32. Defendants concede that the Winery's GALLO mark is extraordinarily strong and distinctive. This strength and distinction is evidenced by the Winery's tremendous sales of GALLO wine and aggressive advertising strategy.

### 2. *Proximity of Goods*

F33. Beverage suppliers commonly use, and license others to use, their marks on a variety of consumer items such as playing cards, games, t-shirts, caps, games, and napkins. From 1986 to 1990, the Winery also placed its GALLO mark on non-wine products. Pasatiempos itself makes playing cards under license for alcoholic beverage companies.

F34. Wine can be used together with cards and poker chips, and can accompany party supplies, such as confetti and paper streamers, on festive occasions.

### 3. *Similarity of the Marks*

F35. Both parties use as their trademark the single word GALLO, spelled identically: G-A-L-L-O.

F36. Both parties present the GALLO mark in all capital letters and in similar typeface.

F37. Both parties sometimes present the GALLO mark in a red banner or bar.

F38. Both parties' labels sometimes depict a rooster.

F39. Defendants stipulate that the Winery's trademark and defendants' trademark are similar.

F40. Pasatiempos's packaging evolved to simulate the Winery's packaging with the increased prominence of Pasatiempos's GALLO mark and rooster symbol, and the use of a red background behind Pasatiempos's GALLO mark.

F41. Plaintiff intends its trademark, the surname of the Winery's founders, to be pronounced GAL–OH. Defendants intend their trademark, which means "rooster" in Spanish, to be pronounced GUY–OH.

F42. At retail outlets, however, consumers confront visual, not audible, stimuli created by the parties' marks. There is no way for consumers to know that the parties intend the marks to be pronounced differently. In fact, nothing on parties' products prevents consumers from pronouncing plaintiff's GALLO mark as GUY–OH, and defendants' GALLO mark as GAL–OH.

F43. Defendants have made no effort to inform consumers to pronounce their mark differently from plaintiff's.

F44. The Winery has begun Spanish-language television advertising.

### 4. *Actual Confusion*

F45. Plaintiff offers a national consumer survey, conducted by the firm Elrick & Lavidge ("Lavidge"), which discloses a significant inference of actual confusion between the sources of parties' products.

F46. The Lavidge survey used the "mall intercept" method. Interviews were conducted with 400 consumers, 200 in each of two matched survey samples. The interviewing in each survey was divided approximately equally among men and women and among shopping centers in five areas nationwide. These are areas in which the products of both Pasatiempos and the Winery are sold.

F47. Consumers of Hispanic origin patronize each of the shopping centers where the interviewing was done. Bilingual interviewers offered each consumer an opportunity to be interviewed in either English or Spanish.

F48. Each individual who was qualified and willing to participate was escorted, one at a time, into a booth or room in an established interviewing center within the shopping center and was invited to be seated. In one of the two surveys ("Survey A"), 200 respondents were shown a 750 mL bottle of Gallo Chablis Blanc wine and were given an opportunity to look at it for as long as desired. That bottle then was covered to remove it from the sight of the interviewee. Next, a Pasatiempos loteria box was uncovered in front of the respondent who, once again, was asked to look at it as long as desired. The loteria box then was covered to remove it from the sight of the interviewee.

F49. Approximately one-half of the interviewees then were asked: "Do you think the two products I have shown you are put out by the same company or by different companies or don't you have an opinion about that?" The other half of the respondents were asked a similar question which differed only in that "by different companies" preceded "by the same company." This was done to eliminate the possible effect of what is called "order bias."

F50. Twenty-five and one-half percent (25.5%) of the respondents to Survey A indicated that the products shown were put out by the same company.

F51. Survey B was what is called a "control survey." The interviewees in it were shown a 750 mL bottle of Beringer Chenin Blanc wine, rather than a bottle of Gallo wine. Otherwise, the procedures followed and the questions asked were the same as in Survey A.

F52. Seven and one-half percent (7.5%) of respondents to Survey B indicated that the products were put out by the same company.

F53. The Lavidge survey demonstrated that approximately 18% of respondents thought that the Winery's wine and Pasatiempos's loteria game were put out by the same company. The Lavidge survey also asked respondents why they had given the answers they did. Of the 200 respondents shown Gallo wine, 42 responded "same company" because both products had a GALLO mark. Lavidge concluded that the overall level of confusion as shown by his survey was between 18% and 20%. Lavidge therefore opines that there is a likelihood of confusion at a significant level from defendants' use of a GALLO mark.

F54. Defendant Pasatiempos's survey, conducted by Dr. Kim R. Robertson ("Robertson"), bears little weight due to several flaws.

F55. First, the order of survey questions conditioned respondents to answer a key question favorably for defendants. The survey's key question was whether the company that makes defendants' products (Pasatiempos) makes any other products and, if so, what products. This question was preceded

by two or three questions that referred to "playing cards, board or table games, or party supplies such as confetti." These precedent questions naturally conditioned respondents to include "playing cards, board or table games, or party supplies such as confetti," rather than wine, in answering the key question. Even Robertson admitted that, in retrospect, it would have been better to ask the earlier questions *after* the key question.

F56. Second, there was no objective confirmation that the respondents matched Robertson's intended sampling universe of 90% Hispanics. Furthermore, Robertson's English-only survey precluded participation by interviewees who spoke only Spanish.

F57. Third, Robertson's survey took place in only one location even though parties sell in multiple areas.

### 5. *Marketing Channels*

F58. Parties' products are both sold in the same channels of trade: liquor stores, convenience stores, grocery stores, restaurants, and drug stores. Many of defendants' customers also sell alcoholic beverages.

F59. Parties are likely to share even more channels of trade in the future. Pasatiempos's goal is to expand its U.S. operations and to sell its products to any and all. Pasatiempos instructs its distributors to "try and sell the products to every human being." Pasatiempos's sales in the United States have increased since this lawsuit began.

F60. Defendants' products are mostly sold in Hispanic communities.

F61. Similarly, the Winery has a higher market share in Hispanic communities than in the general market. The Winery's studies show that 80–90% of Hispanics are aware of the GALLO branded wine. The Winery accounts for 40–50% of all wine sales in Hispanic accounts which have more than 50% Hispanic clientele.

F62. Retailers in Hispanic areas are not patronized exclusively by Hispanics. These retailers are patronized by a diverse ethnic clientele, including people who do not speak Spanish.

F63. Defendants' products are availed not only to Spanish-speaking Hispanics, but to anyone. In fact, defendants converted their products catalogs from Spanish to Spanish/English to accommodate potential customers who do not speak Spanish.

F64. In 1992, defendants began selling their products in Tianguis stores in Los Angeles. Tianguis is a chain retailer, a part of VONS supermarkets, which caters to Hispanic clientele. Tianguis makes GALLO brand wine 63% of their wine sales.

### 6. *Type of Goods*

F65. Defendants admit that their products are relatively low-priced items to which consumers devote little time or study prior to making a purchase decision.

F66. Wine is also the type of products to which purchasers devote little attention before making the purchase decision.

### 7. *Defendants' Intent to Imitate the Winery's Mark*

F67. The current owners of Pasatiempos knew of the Winery's mark when they first began to sell products in the United States.

F68. By 1990, defendants had begun to use their GALLO mark on many products in the United States without conducting a trademark search in the United States. Defendants also failed to obtain legal advice concerning their use of a GALLO mark in the United States.

### 8. *Likelihood of Expansion of Product Lines*

F69. There is no evidence that either parties will expand its business to compete directly with the other.

### D. *Defendants' Affirmative Defenses to the Federal Claim*

#### 1. *Laches*

##### a. *The Winery's Knowledge of Defendants' Use*

F70. The Winery employs many "watchdogs" to discover others' use of a GALLO mark, including its own field force and distributors, trademark watch services, clipping services, law firms, advertising agencies, and retailers. Each of these sources was in place prior to 1987.

F71. The Winery first discovered defendants' products in the marketplace in mid–1992, after which it investigated the extent of

defendants' use of the GALLO mark. The Winery then sent a cease and desist letter to Pasatiempos. Receiving no reply, the Winery filed this lawsuit in November 1992.

#### b. *The Winery's Knowledge of Pasatiempos's Trademark Applications*

F72. Plaintiff knew of defendants' application to register their GALLO trademark for playing cards in 1987. Plaintiff also knew of defendants' trademark application for board games in 1988. All of defendants' registrations were in Pasatiempos's name, not Don Clemente's name, and showed an address in Mexico.

F73. Plaintiff sought and received an extension of time to oppose these applications from the United States Patent and Trademark Office ("PTO"), but ultimately did not oppose them.

F74. Instead, parties' counsel conferred in 1988. Defense counsel Thomas Sisson only sent exemplars of the products to GALLO without indicating that Pasatiempos actually used the GALLO mark in the United States. Sisson indicated that Pasatiempos's address was in Mexico, without mentioning DCI and DCI's offices in the United States.

F75. The Winery conducted a comprehensive investigation to determine whether defendants' GALLO marks were actually in use in the United States. The Winery consulted its sales force and distributors; engaged a professional trademark investigator to conduct a search; checked with Customs and the Journal of Commerce; consulted the U.S. Playing Card Company in Cincinnati, Ohio; and conducted a Dunn & Bradstreet investigation. Moreover, the Winery directly asked Pasatiempos which declined to provide any U.S. sales information. Plaintiff found no evidence of actual use in the United States.

F76. Parties conducted settlement negotiations, but resolved nothing.

F77. At the time of Pasatiempos's applications, trademark applications could be based on token use. Based on its research, the Winery concluded that Pasatiempos's applications were based on no actual use or, at best, on token use.

F78. As it turns out, Pasatiempos's sales in the United States in 1987 and 1988 were only $7,732 and $15,136, respectively.

F79. Defendants made no advertising or promotional efforts from 1987 to 1992, apart from its products catalogs.

#### 2. *Estoppel By Acquiescence*

F80. Plaintiff never affirmatively consented to, or otherwise encouraged, defendants' use of a GALLO mark in the United States.

#### 3. *Prior, Continuous Use in the United States*

F81. Plaintiff's mark achieved secondary meaning in the United States *no later than* 1946 when its first GALLO mark issued.

F82. One witness testified to seeing GALLO-brand paper products in the United States before 1946. He testified to the sale of GALLO-brand playing cards and loteria only on Olvera Street, a one-block area in downtown Los Angeles, from the 1930s to the present. The volume of sales is unknown.

#### E. *Dilution*

##### 1. *Distinctiveness and Secondary Meaning*

F83. The Winery's efforts have bestowed tremendous distinctiveness, commercial strength and selling power to their GALLO mark.

##### 2. *Loss of Distinctiveness*

F84. Proliferation of GALLO-labeled non-wine products in the United States would foreseeably lead to increased cross-merchandising of plaintiff's products with other products in retail outlets.

F85. Apart from an injunction against others' use of the GALLO mark altogether, plaintiff cannot enforce its desire to prevent cross-merchandising.

F86. Defendants' continued use of the GALLO mark on paper products would erode the public's identification of the GALLO mark with plaintiff alone, thus diminishing its distinctiveness and commercial value.

F87. The foregoing findings of fact, to the extent they state conclusions of law, are

adopted as the Court's conclusions. The conclusions of law that follow, to the extent they state findings of fact, are adopted as the Court's findings.

## II. CONCLUSIONS OF LAW

C1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331, 1332, 1338(a), 1338(b) and 15 U.S.C. § 1121.

C2. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

### A. Law Applicable to Plaintiff's Federal Trademark Infringement Claim

C3. Plaintiff must prove the following elements of a federal trademark infringement claim under the Lanham Act: (1) plaintiff owns valid registrations of the GALLO marks; (2) defendants' mark is a colorable imitation of plaintiff's mark; (3) defendants' goods have been used in commerce; (4) such use was without plaintiff's consent; and (5) such use is likely to cause confusion or to cause mistake or to deceive. 15 U.S.C. § 1114(1); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 12 U.S.P.Q.2d 1657, 1670, 1989 WL 159628 (E.D.Cal.1989), *aff'd*, 967 F.2d 1280 (9th Cir.1992). The Winery has established each of these elements in this matter.

### 1. Plaintiff's Ownership of GALLO Trademarks

C4. Plaintiff owns federal trademark Registration Numbers 444,756, 891,339, 778,-837, 854,802, 887,959 and 964,331. These GALLO marks are incontestable and are not challenged by defendants.

### 2. Colorable Imitations

C5. In determining whether a defendant's marks is a "colorable imitation" of plaintiff's mark, the "analysis is conducted on three levels: sight, sound and meaning." *Gallo Cattle*, 12 U.S.P.Q.2d at 1671.

C6. As parties stipulate, their marks are solely composed of or dominated by the word "GALLO," spelled in the same manner. Their marks are therefore visually similar. Moreover, parties present their marks in all-capitalized letters, in similar typeface, and frequently in a red background.

C7. It is well-established that notwithstanding the rules of phonetics, there is no such thing as the correct pronunciation of a trademark. *JouJou Designs, Inc. v. JoJo Ligne Int'l, Inc.*, 821 F.Supp. 1347, 1354 (N.D.Cal.1992).

C8. There is no correct pronunciation of defendants' and plaintiff's marks as either GUY–OH or GAL–OH. Parties' intended pronunciations of their respective marks do not control their actual pronunciation by consumers.

C9. As parties stipulate, plaintiff's and defendants' marks are similar. Defendants' mark is therefore a colorable imitation of plaintiff's mark.

### 3. Goods Used In Commerce

C10. It is undisputed that defendants distribute their products in the United States.

### 4. Use Without Plaintiff's Consent

C11. Although defendants raise the affirmative defense of estoppel by acquiescence, discussed below, it is undisputed that plaintiff never affirmatively consented to defendants' use of the GALLO mark.

### 5. Likelihood of Confusion

C12. Likelihood of confusion "is not limited only to confusions as to the source or origin of goods. Rather, the appropriate inquiry is whether the average purchaser would be likely to believe that the infringer's product has 'some connection' with the trademark owner." *Grey v. Campbell Soup Co.*, 650 F.Supp. 1166, 1173 (C.D.Cal.1986), *aff'd* 830 F.2d 197 (9th Cir.1987).

C13. The factors relevant to determining the likelihood of confusion include the following: (1) strength of plaintiff's mark; (2) proximity of the goods; (3) similarity between plaintiff's and defendant's marks; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and degree of overlap of plaintiff's and defendant's marketing channels; (7) defendants' intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Gallo Cattle*, 12 U.S.P.Q.2d at 1672.

C14. This likelihood of confusion test is not meant to create "requirements or hoops" that a district court need jump through to make a determination. *Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir.1990). This Court need not

recite and apply specific factors. *Id.* Rather, these non-exclusive factors serve as helpful guidelines to the Court.

■ C15. Plaintiff has firmly proven likelihood of confusion in view of the Ninth Circuit's multi-factor test.

### a. *Strength of Plaintiff's Mark*

■ C16. A strong trademark is distinctive in that the public is aware of the mark and associates that mark with a single business or source of supply. *Gallo Cattle*, 12 U.S.P.Q.2d at 1672.

■ C17. Although surname marks are inherently indistinctive, they may attain distinctiveness by acquiring secondary meaning which, in turn, is earned by long use, extensive advertising, and widespread public recognition. *Id.*

C18. Plaintiff's mark has achieved secondary meaning, and is very strong and distinctive.

■ C19. Strength of plaintiff's mark simply means that the mark is more distinctive than descriptive or suggestive, and therefore more susceptible to protection as an initial matter. *Gallo Cattle*, 967 F.2d at 1291. A plaintiff's restricted use of a strong mark on certain products does not affect the strength of the mark. *Id.*

### b. *Proximity of Goods*

C20. Parties' products are related insofar as makers of alcoholic beverages commonly place their trademarks on the types of merchandise that defendants sell. Furthermore, wine and defendants' products may be used together on festive occasions or in ordinary instances of playing games.

### c. *Similarity of Marks*

C21. Parties' marks are similar as discussed in Conclusions 5 through 9.

### d. *Actual Confusion*

C22. Plaintiff's survey reveals a significant inference of actual confusion.

### e. *Marketing Channels*

■ C23. Similarity of trade channels does not require sales of both parties' goods by identical vendors, but only by "the same type of distribution channels," e.g., supermarkets and grocery stores. *Century 21*

*Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 877 (Fed.Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 812, 121 L.Ed.2d 685 (1992).

C24. Defendants' primary market in an ethnic neighborhood does not preclude a finding of likelihood of confusion. *See J.B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187 (9th Cir.1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976).

C25. The Winery and Pasatiempos share the same marketing channels: restaurants, liquor stores, drug stores, and grocery stores.

### f. *Types of Goods and Degree of Care*

C26. Similar trademarks are more likely to result in confusion when the products at issue are of relatively low cost, where buying decisions are made quickly and without extensive study, and where certain consumers are not sophisticated. *Gallo Cattle*, 12 U.S.P.Q.2d at 1674.

C27. Both wine and Pasatiempos's paper products are relatively inexpensive and are bought quickly without extensive study.

### g. *Defendants' Intent in Selecting the Mark*

■ C28. Intent to capitalize on another's brand may be shown by direct or circumstantial evidence. *Gallo Cattle*, 12 U.S.P.Q.2d at 1674.

■ C29. When the senior user's trademark is famous in the marketplace and when the junior user was aware of the trademark and its fame, a presumption of bad faith arises from the choice of the same name. *Id.* This presumption is rebuttable by evidence of other purposes to adopt the mark.

C30. The growing similarity between Pasatiempos's GALLO mark and the Winery's historical marks does not rebut this presumption.

### B. *Affirmative Defenses*

C31. Defendants' bear the burden of establishing each element of all three affirmative defenses by a preponderance of the evidence.

### 1. *Laches*

C32. The application of the defense of laches is committed to the sound discretion of the district court. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed.Cir.1992).

C33. Laches is not a favored defense in trademark cases. *Gallo Cattle*, 12 U.S.P.Q.2d at 1676.

C34. Defendant may prevail on its laches defense by proving two elements: (1) plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time plaintiff knew or reasonably should have known of its claim against defendant; and (2) the delay operated to the prejudice or injury of the defendant. *Aukerman*, 960 F.2d at 1021.

C35. The clock does not begin ticking until plaintiff actually knew or a "reasonably prudent person" should have known of defendant's conduct. *Id.* at 1932.

C36. A plaintiff must offer an adequate explanation for his subjective ignorance when defendant's conduct has been open and plaintiff possessed facts which would have put upon a "man of ordinary intelligence the duty of inquiry." *Id.*

C37. The Winery first knew in 1987 of defendants' applications to register marks in the United States. Despite an extensive investigation, however, the Winery could find no evidence that defendants were actually using a GALLO mark in the United States. The Winery's inquiry to defendants on this issue was rebuffed. Thus, the Winery neither knew nor reasonably should have known that it had an infringement claim against defendants. An infringement claim requires proof that defendants were using the mark in the United States.

C38. Plaintiff did not delay in filing suit from the time that it discovered defendants' infringing use in the United States in mid-1992.

C39. The same result is reached under an alternative laches test which includes six considerations: (1) the strength and value of the trademark rights; (2) plaintiff's diligence in enforcing its mark; (3) the harm to plaintiff if relief is denied; (4) whether defendant acted in good faith ignorance of plaintiff's rights; (5) competition between plaintiff and defendant; and (6) the harm suffered by defendant because of plaintiff's delay. *See Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 508 (9th Cir. 1991).

C40. The Winery's trademark rights are very strong.

C41. The Winery's good faith investigation into the presence of Pasatiempos's goods and headquarters in the United States evidences its diligence in enforcing its mark.

C42. The harm to the Winery due to a successful laches defense is self-evident: continuing infringement and dilution of its trademarks by defendants.

C43. Defendants were not in good faith ignorance of the Winery's rights.

C44. There is no evidence that defendants' sales in the United States would suffer substantially if they were ordered to stop using a GALLO mark.

### 2. *Estoppel By Acquiescence*

C45. Estoppel by acquiescence includes the two elements of laches—(1) plaintiff's unreasonable and inexcusable delay, (2) inducing the belief that it has abandoned its claim against the alleged infringer—and adds (3) affirmative conduct inducing the belief that it has abandoned its claim against the alleged infringer, and (4) detrimental reliance by infringer. *A.C. Aukerman Co. v. Miller Formless Co.*, 693 F.2d 697, 701 (7th Cir. 1982).

C46. Pasatiempos's failure on the laches defense dooms the estoppel defense. Furthermore, the Winery has never *affirmatively* induced Pasatiempos's to believe that the Winery abandoned its claim.

### 3. *Prior Continuous Use in the United States*

C47. Defendants must prove three elements to prevail on its prior use defense: (1) Pasatiempos's predecessor CJ possessed valid trademark rights to a GALLO mark in the United States before the Winery acquired such rights; (2) CJ's United States trademark rights were assigned to defendants, and (3) the good will of CJ's business in the

United States, if any, was also assigned or transferred.

■ C48. The first element requires that CJ first established secondary meaning in its GALLO mark before the Winery achieved secondary meaning in its GALLO mark. In a dispute over priority of use for an inherently indistinctive mark requiring secondary meaning, mere priority of use is insufficient. 1 McCarthy, *Trademarks and Unfair Competition* § 16.12, at 745 (2d ed. 1984).

■ C49. Secondary meaning—a mental association between the mark and a single source of the product—is generally proved by length and manner of use, extensive advertising and promotion, amount of sales, number of customers and survey evidence. 1 McCarthy, *supra*, § 15.10.

C50. Defendants' submission of only the following evidence fails to establish secondary meaning for their GALLO mark: (1) one of the playing cards in the deck currently produced by defendants says that the GALLO card was shown at exhibitions in Chicago and St. Louis and transported from Mexico to Cincinnati before 1933; and (2) at least one individual has seen GALLO playing cards and loteria games for sale on Olvera Street since the early 1930s.

C51. Defendants fail to prove the first element of the prior use defense. Like the others, this defense must fail.

C. *State Trademark Infringement and Unfair Competition Claims*

■ C52. Plaintiff's second and fourth claims arise under California's trademark law (Cal.Bus. & Prof.Code § 14200 *et seq.*) and California's prohibition of unfair competition (Cal.Bus. & Prof.Code § 17200). The elements of trademark infringement and unfair competition are "essentially the same." *Gallo Cattle,* 967 F.2d at 1288 n. 2. Accordingly, the two claims are discussed in Conclusions 32 through 44.

■ C53. Liability for trademark infringement and unfair competition exists under California law when an appreciable number of reasonable buyers are likely to be confused by the similarity of plaintiff's and defendants' marks. *North Carolina Dairy Foundation, Inc. v. Foremost–McKesson, Inc.,* 92 Cal.App.3d 98, 110, 154 Cal.Rptr. 794 (1979). Thus, the Lanham Act's "likelihood of confusion" standard applies equally to claims under California law. *Golden Door, Inc. v. Odisho,* 646 F.2d 347, 349 (9th Cir.Cal. 1980).

C54. Defendants have violated California's trademark infringement and unfair competition laws.

C55. The availability of laches as a defense to claims only for injunctive relief against continuing infringement is not clear under California law. *Compare H. Moffat Co. v. Koftinow,* 104 Cal.App.2d 560, 565–566, 232 P.2d 15 (1951) *with Tustin Community Hospital, Inc. v. Santa Ana Community Hospital Ass'n,* 89 Cal.App.3d 889, 894, 153 Cal.Rptr. 76 (1979). In any event, defendants' laches defense fails against plaintiff's state claim for the reasons discussed above.

C56. Defendants' estoppel by acquiescence defense is likewise unavailable under California law. *See Family Record Plan, Inc. v. Mitchell,* 172 Cal.App.2d 235, 246, 342 P.2d 10 (1959) (requiring circumstances "amounting to abandonment" of rights in the mark).

C57. Defendants' first use defense is based on the federal Lanham Act and therefore does not apply to the claims under California law.

■ C58. Under California law, the user of a mark that acquires secondary meaning is accorded protection against its use by others, regardless of who first used the mark. Acquisition of secondary meaning, rather than priority of use, is controlling. *Family Record Plan, supra,* 172 Cal.App.2d at 243, 342 P.2d 10.

■ C59. Defendants' GALLO mark has not achieved secondary meaning in the United States. Defendants' sales have been minimal; they have done no advertising or other promotion of the GALLO mark; and there was no persuasive survey evidence demonstrating that their mark possessed secondary meaning.

**D.** *Plaintiff's Trademark Dilution Claim*

C60. Plaintiff's third claim for relief is for trademark dilution under Cal.Bus. & Prof. Code § 14330, which reads in pertinent part:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, . . . , shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

C61. The essence of the dilution claim is that even if no consumers are likely to be confused by defendants' use of the GALLO mark on their products, such use dilutes the distinctive nature of the GALLO mark as standing for Gallo Winery and its products.

C62. The dilution doctrine grants protection beyond prevention of "likelihood of confusion." 2 McCarthy, *supra* § 24.13. Its focus is to prevent the gradual "whittling away" of a firm's distinctive trademark, rather than to protect consumers. *Id.*

C63. Plaintiff must show the following to establish dilution: (1) plaintiff owns valid registrations of the GALLO marks; (2) defendants' marks are a colorable imitation of plaintiff's marks; (3) defendants' use was without plaintiff's consent; (4) plaintiff's marks is distinctive or has acquired secondary meaning; and (5) defendants' mark threatens to dilute the distinctiveness of the GALLO mark, or tarnish its reputation. *Gallo Cattle*, 12 U.S.P.Q.2d at 1675.

C64. Given the foregoing discussion, only the last element warrants discussion. There is threat of dilution when there is a "risk of erosion of the public's identification of [the] very strong mark with plaintiff alone, thus diminishing its distinctiveness." *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 457, 469 (N.D.Cal.1991).

C65. Pasatiempos's use of the GALLO mark on its paper products constitutes dilution of plaintiff's mark within the meaning of section 14330. Such use would likely detract from the unique character of plaintiff's GALLO mark.

**E.** *Remedy*

C66. Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir.1988).

C67. Plaintiff is entitled to a permanent injunction barring further infringement and dilution and an order pursuant to 15 U.S.C. § 1119 cancelling Pasatiempos's federal registrations containing the word GALLO.

C68. Such injunction shall be operative and may be enforced by proceedings to punish for contempt, or otherwise, by this Court or by any other United States district court in whose jurisdiction defendants may be found. 15 U.S.C. § 1116.

IT IS SO ORDERED.

IT IS FURTHER ORDERED THAT each party shall submit a brief discussing the appropriate scope of the injunction. Each brief shall not exceed fifteen (15) pages in length and must be filed within 30 days of the filing date of this order.