**E. & J. GALLO WINERY, Plaintiff,**

**v.**

**SPIDER WEBS LTD., Steve E. Thumann, Pierce A. Thumann, and Fred H. Thumann, Trustee, Defendants.**

**No. CIV. A. H–00–450.**

United States District Court, S.D. Texas.

Jan. 29, 2001.

Craig William Weinlein, Carrington Coleman et al, Dallas, TX, for E & J Gallo Winery, plaintiff.

Bernard Lilse Mathews, III, Hocker Morrow et al, Spring, TX, for Spider Webs Ltd, Steve E Thumann, Pierce A Thumann, Fred H Thumann, Trustee, defendants.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

### I. *Introduction*

Pending before the court is Plaintiff E. & J. Gallo Winery's ("Gallo") Motion for Partial Summary Judgment (# 32). Gallo contends that there exist no issues of material fact on its claims that Defendants Spider Webs Ltd., Steve E. Thumann, Pierce A. Thumann, and Fred H. Thumann, Trustee, (collectively "Spider Webs") are jointly and severally liable for violations of the Texas Anti–Dilution Statute, TEX. BUS. & COM. CODE ANN. § 16.29 (Vernon 2000), and the federal Anti–Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d) (1999 & Supp.2000). Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that partial summary judgment is warranted.

### II. *Factual Background*

Gallo is a California corporation that manufactures and sells alcoholic beverages and related goods under the trade names THE WINERY OF ERNEST & JULIO GALLO, E. & J. GALLO WINERY, ERNEST AND JULIO GALLO WINERY, and GALLO WINERY, among others. According to Gallo, these trade names derive from the names of two brothers, Ernest Gallo and Julio Gallo, who founded the company. Between March 24, 1953,

and March 9, 1999, Gallo registered twelve trademarks on the Principal Register in the United States Patent and Trademark Office, including GALLO, ERNEST & JULIO GALLO, GALLO SONOMA, and ERNEST AND JULIO GALLO & DESIGN. In particular, Gallo registered the mark ERNEST & JULIO GALLO on October 20, 1964, as Registration No. 778,837. Gallo also owns or controls several Internet domain names that incorporate Gallo's registered trademarks, including: GALLO.DE, EJGALL.DE, ERNEST–JULIO–GALLO.COM, GALLOWINERY.COM, EJGALLO.COM, and GALLOWINE.COM. Gallo has sold more than four billion bottles of wine bearing the Gallo family of trademarks and has spent more than $500 million promoting the brand.

Defendants, brothers Steve and Pierce Thumann and their father, Fred Thumann, Trustee, operate Doortown, Incorporated, a family-owned prehanging millwork business in Houston, Texas. The business has been in operation for more than fifty years. Fred Thumann is the President and Chairman of the Board, Steve Thumann is Vice–President, and Pierce Thumann's title is "Inside Sales." In approximately June 1999, the Thumanns created Spider Webs Ltd. as a Texas general partnership. Steve and Pierce Thumann and Fred Thumann, Trustee, are the sole partners. Fred Thumann is a partner in his capacity as trustee of the Fred H. Thumann Trust. Spider Webs Ltd. does not have any employees and is operated at the same business address as Doortown, Inc. According to Steve Thumann, Spider Webs' business plan is to develop Internet address names. He further described the business as "an internet-type business, consumer advocates, building web sites." Since its creation, Spider Webs has registered nearly 2,000 Internet domain names for an average of $70.00 each, including the names of cities, the names of buildings, names related to a business or trade (such as air conditioning or plumbing), and the names of famous companies. It offers many of these names for sale on its web site and through the online auction site Ebay.com, although ERNESTANDJULIOGALLO.COM is apparently not among them.

On August 26, 1999, through a company called Network Solutions, Inc., Spider Webs registered the domain name "ERNESTANDJULIOGALLO.COM" in the name of Spider Webs Ltd. Steve Thumann stated in his deposition that Spider Webs regarded the domain name as "real estate" and that they intended to hold onto and eventually make a profit from the name. On February 11, 2000, Gallo filed its Original Complaint, alleging violations of the ACPA, dilution under federal and Texas law, trademark infringement under federal and Texas law, and unfair competition under federal and Texas law. Gallo seeks a permanent injunction to prevent Spider Webs from "a. using the Internet domain name ERNESTANDJULIOGALLO.COM; b. registering any domain name that contains the word 'Gallo'; and c. registering any Internet domain name that contains the words 'Ernest' and 'Julio.'" Gallo also seeks an order requiring Spider Webs to transfer to Gallo the domain name "ERNESTANDJULIOGALLO.COM" as well as any Internet web sites, domain names, databases, programs, or other storage means using the Gallo name or name similar to the Gallo marks. Gallo further requests statutory damages, punitive damages, court costs, and attorneys' fees.

Approximately six months after the commencement of this action, Spider Webs published a web site at ERNESTANDJULIOGALLO.COM, devoting space to discussions of the pending litigation as well as the risks associated with alcohol use and alleged misrepresentations made by corporations. As of the date of this opinion, the web site accessed by typing in the Internet address ERNESTANDJULIOGALLO.COM is called "SpinTopic," which appears to be a site for accessing anti-corporate articles and opinions, including a section for commentary about the use of alcohol. It is unclear whether Spider Webs is affiliated with SpinTopic. On Au-

gust 31, 2000, Gallo moved for partial summary judgment on its claims of violations of the Texas Anti–Dilution Statute and the ACPA.

### III. *Analysis*

#### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999); *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 324 (5th Cir.1997), *cert. denied*, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). The moving party, however, need not negate the elements of the nonmovants' case. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86,

106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Colson*, 174 F.3d at 506; *Marshall*, 134 F.3d at 321–22; *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075. All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.*, 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *see Colson*, 174 F.3d at 506; *Marshall*, 134 F.3d at 321; *Messer v. Meno*, 130 F.3d 130, 134 (5th Cir.1997), *cert. denied*, 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999); *Hart v. O'Brien*, 127 F.3d 424, 435 (5th Cir.1997), *cert. denied*, 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999); *Songbyrd, Inc. v. Bearsville Records, Inc.*, 104 F.3d 773, 776 (5th Cir.1997). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *see Marshall*, 134 F.3d at 321. Nonetheless, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.' " *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072.

The nonmovants' burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little*, 37 F.3d at 1075; *see Hart*, 127 F.3d at 435; *Wallace*, 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*,

513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir. 1990) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovants fail to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### B. *Texas Anti–Dilution Statute*

■ Gallo asserts that it is entitled to summary judgment on its claim under the Texas Anti–Dilution Statute. The statute provides:

> A person may bring an action to enjoin an act likely to injure a business or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services. An injunction sought under this section shall be pursuant to Rule 680 et seq. of the Texas Rules of Civil Procedure.

TEX. BUS. & COM. CODE ANN. § 16.29. Therefore, in order to establish a dilution claim under the Texas Anti–Dilution Statute, Gallo must show that it owns a distinctive mark and that there is a likelihood of dilution. *See Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513, 1564 (S.D.Tex. 1996), *aff'd,* 155 F.3d 526 (5th Cir.1998); *see generally* RESTATEMENT OF THE LAW (3D) UNFAIR COMPETITION § 25 (1995). "The purpose of an anti-dilution statute is to prevent the gradual 'whittling away' of a party's distinctive trademark or trade name." *Pebble Beach*

*Co.,* 942 F.Supp. at 1564 (citing *Fruit of the Loom, Inc. v. Girouard,* 994 F.2d 1359, 1363 (9th Cir.1993)). Unlike the federal anti-dilution statute, which requires that a defendant's acts constitute a "commercial use" of a registered mark, the broader Texas version does not contain language requiring a commercial use.

Under the Texas statute, there is no requirement that the plaintiff and defendant be business competitors or that likely consumer confusion exist. *See Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1081 (5th Cir.), *cert. denied,* 522 U.S. 915, 118 S.Ct. 299, 139 L.Ed.2d 231 (1997). "Dilution is a concept most applicable where a subsequent user uses the trademark of a prior user for a product so dissimilar from the product of the prior user that there is no likelihood of confusion of the products or sources, but where the use of the trademark by the subsequent user will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark." *Holiday Inns, Inc. v. Holiday Out in Am.,* 481 F.2d 445, 450 (5th Cir.1973). Dilution legislation flowed from a desire to prevent "hypothetical anomalies" such as "Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1031 (2d Cir.1989).

■ "In order to establish a dilution claim, the plaintiff must show (1) ownership of a distinctive mark and (2) a likelihood of dilution." *Pebble Beach Co.,* 942 F.Supp. at 1564 (citing *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 506 (2d Cir.1996)). "Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." *Mead Data Cent., Inc.,* 875 F.2d at 1030. Distinctiveness can be proved through the uniqueness of the mark or because it has acquired a secondary meaning. *See id.* at 1032. "A trademark has a secondary meaning if it has become so associated in the mind of the

public with that entity ... or its product that it identifies the goods sold by that entity and distinguishes them from goods sold by others." *Id.* (citations omitted). A registered mark is "presumed to be distinctive and should be afforded the utmost protection." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986). Current registration of a trademark is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b); *see Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,* 182 F.3d 598, 601 n. 2 (8th Cir.1999). The Texas statute does not require a mark to be famous in order for it to be distinctive. *See Advantage Rent–A–Car, Inc. v. Enterprise Rent–A–Car Co.,* 238 F.3d 378, 380–81 (5th Cir.2001).

■ Currently, Gallo owns several registered trademarks that contain the names "ERNEST," "JULIO," and "GALLO." In particular, it owns the registered trademark "ERNEST & JULIO GALLO." These registrations establish the validity and distinctiveness of Gallo's mark. *See Lois Sportswear, U.S.A., Inc.,* 799 F.2d at 871. Furthermore, "Gallo" is the family name of Gallo's founders, and "a family name is entitled to protection as a mark so long as it has acquired a recognized 'secondary meaning' through use, advertising, and public recognition." *E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F.Supp. 457, 462 (N.D.Cal.1991) (citing *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988); *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1218 (9th Cir.1987)). As noted by other courts, " 'Gallo' has clearly become associated with wine in the United States such that its evolution to 'secondary meaning' status may not be seriously questioned." *Id.; accord E. & J. Gallo Winery v. Pasatiempos Gallo, S.A.,* 905 F.Supp. 1403, 1407, 1413 (E.D.Cal.1994). "By virtue of widespread sales and promotion for over half a century, the Winery's GALLO mark has become extraordinarily strong and distinctive." *Id.* at 1407. At deposition, Steve Thumann acknowledged that the Gallo mark is well known as a brand of wine:

Q. Okay. At the time you registered the domain—the domain address to ernestandjuliogallo.com, would you agree that Ernest & Julio Gallo was a famous brand name for wines?

A. It was well-known. Whether famous as starlike—Yes.

Thus, Gallo has shown that its trademark is distinctive.

Gallo must also prove that Spider Webs' actions create a likelihood of dilution of Gallo's distinctive trademarks. "A likelihood of dilution may be shown under two separate theories: dilution by 'blurring' or 'tarnishment.' " *Pebble Beach Co.,* 942 F.Supp. at 1564 (citing *Hormel Foods Corp.,* 73 F.3d at 506; *Jordache Enters. Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1489 (10th Cir.1987)); *accord Exxon Corp.,* 109 F.3d at 1081. Dilution by blurring occurs when there has been "a diminution in the uniqueness and individuality of the mark." *Id.; see Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1326 n. 7 (9th Cir.1998). Dilution by tarnishment requires "an injury resulting from another's use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the plaintiff's mark." *Exxon Corp.,* 109 F.3d at 1081.

As explained by the Seventh Circuit:

The gravamen of a dilution complaint is that the continuous use of a mark similar to plaintiff's works an inexorably adverse effect upon the distinctiveness of the plaintiff's mark, and that, if he is powerless to prevent such use, his mark will lose its distinctiveness entirely.... [D]ilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark.

*Polaroid Corp. v. Polaraid, Inc.,* 319 F.2d 830, 836 (7th Cir.1963) (citations omitted); *accord Intermatic Inc. v. Toeppen,* 947 F.Supp. 1227, 1240 (N.D.Ill.1996). Federal

courts have held that a defendant's preventing a plaintiff from identifying its goods and services on the Internet constitutes dilution. *See Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 495 (2d Cir.), *cert. denied*, 530 U.S. 1262, 120 S.Ct. 2719, 147 L.Ed.2d 984 (2000); *Panavision Int'l, L.P.*, 141 F.3d at 1327; *Intermatic Inc.*, 947 F.Supp. at 1240. These courts have reasoned that the unauthorized registration of a trademark lessens the capacity of the trademark owner to identify uniquely and to distinguish its goods and services. *See id.*

■ In the case at bar, Spider Webs has used a web site accessed through the Internet address ERNESTANDJULIOGALLO.COM to display information about the E. & J. Gallo Winery and the risks associated with alcohol consumption as well to comment about the instant lawsuit, including posting on the web site a letter from Gallo to Steve Thumann regarding its claims against Spider Webs. In a sworn declaration, Craig W. Weinlein ("Weinlein"), an attorney representing Gallo in this matter, states that "[o]n August 15, 2000, [Weinlein] accessed the web site hosted at WWW.ERNESTANDJULIOGALLO.COM and made a printout of the contents of the web site ... attached hereto." On the first page, containing an icon for "SW Ltd." in the upper left-hand corner and the Internet address "http://www.ernestandjuliogallo.com/press.htm" in the lower left-hand corner, is a picture of the upper-half of a wine bottle marked "Whiney Winery." It is captioned, "As Consumer Advocates, We Welcome Your Visit To Our Site!" and "Bringing You The Facts About Alcohol." Its table of contents lists "Alcohol Awareness," "Our Mission," "Press Release," "Real Corporate Dialogue," "Who Are We?," and "Contact Us." The Alcohol Awareness page states:

1. Fetal Alcohol Syndrome (FAS) Is One Of The Leading Causes Of Birth Defects And Developmental Disabilities In The United States, And
Is One Of The Leading Causes Of Mental Retardation In The Western Hemispere [sic].

2. A Daily Glass Of Wine Can Increase Your Weight By As Much As 10 Pounds A Year.

3. Alcohol And Related Crimes Take Up An Estimeted [sic] 50% Of Law Enforcement Time, And Nearly ⅓ Of Their Total Budget

4. As Many As 360,000 Of The Nation's 12 Million Undergraduates Will Die From Alcohlo [sic] Related Causes While In School. *This Is More Than The Number That Will Receive M.A. And Ph.D. Degrees!*

5. 79% Of Alcohol Related Violence Begins In The Home

Gallo points out the crude formatting and the misspellings on the page. The "Our Mission" page explains:

Corporate America Spends Billions Of Dollars Yearly To Promote Their Products And Services To The Consumers Of The World. As People, We Tend To Take These "Advertisements" In Stride Simply Due To The Fact That We Are Constantly Assaulted By Them Every Day Of Our Lives. Unfortunately, Not Everyone Can See Beyond "These Imaginary Worlds" Created By Big Corporations. For Example, Children Often See Their Icons And Wish To Emulate Them. Some Of It Is Harmless, But When It Comes To Products Such As Alcohol And Tobacco, WE NEED TO DRAW A LINE! It Is Our Goal To Make Certain That The Internet Is A Free Space To Speak Your Mind, And Inform Others Of Facts That Are Often Misrepresented To The Public By The Corporate World.

The following page reads:

"Press Release"

Gallo Wine Attempts To harvest More Than Grapes. Gallo Sues Texas Entrepreneurs Who Legally Registered A Dot Com Address Before November 1999, Which Incorporates A Portion Of The Name Which Was Trademarked In The Physical World.

The Computer Language Registered By The Good Folks In Texas Is Not Trademarked. The Texas Entrepreneurs Claim Their 1st And 14th Amendment Rights Are Being Violated, And Vow To Clear Their Good Names, And Be Exonerated From The Damaging Classification As Traffickers, And Cybersquatters.

The Texans Can Only Assume "BIG BUSINESS" Through Their Lobbyist Have Influenced Certain Politicians, And Penned A Law Attempting To Harness The Internet; Crossing International Borders.

The Passing Of The "Anticybersquatting Consumer Protection Act" Was A Violation Of All Americans Rights To Freedom OF Speech, And The Right To Due Process Before Your Property Can Be Seized.

This Law Was Signed Into Existence Without The Knowledge Of The World, And Against The Will Of The President Of The United States Of America.

The pages designated "Real Corporate Dialogue" contain a letter sent by Gallo Associate General Counsel Paul W. Reidl to Steve Thumann by electronic mail and certified mail on December 22, 1999, explaining Gallo's position that Spider Webs' registration of Gallo's trademark as an Internet domain name is unlawful and that Gallo will take all necessary action to protect its mark. The remaining two entries listed in the table of contents are not part of the record. While the first page of the web site contains, in small text, the disclaimer "This Site Is Not Affiliated With Ernest & Julio Gallo® Wineries," none of the other pages contains such language. Spider Webs contends that this web site was active for only about forty-eight hours but has submitted no evidence to support this assertion. The court notes that the pages previously accessible by the domain name at issue in this case are now available through the domain names "spiderwebsltd.com" and "modestocalifornia.org."

The web site currently accessed by typing in the Internet address ERNESTANDJULIOGALLO.COM is called "SpinTopic," which appears primarily to be a site for articles and opinions critical of corporations, but which also includes a section designated for commentary on alcohol. While it is unclear whether "SpinTopic" is a web site controlled by Spider Webs, its access through the domain name address at issue indicates that the domain name has been developed by Spider Webs. At deposition, Steve Thumann explained:

A. Well, we come to find out ... what would happen if—if you typed in a domain address that we had registered and not developed.

Q. What happens?

A. A page comes up that says unknown host.

\* \* \* \* \* \*

... And that may change from time to time. Sometimes it just says page not found. Sometimes it finds—comes up unknown host.

Thus, at present, when a user types in the domain name ERNESTANDJULIOGALLO.COM, he reaches a developed web site rather than a message such as "unknown host" or "page not found." Pages printed off of the SpinTopic web site when accessed through the name ERNESTANDJULIOGALLO.COM contain the header "http://www.ernestandjuliogallo.com" on the upper right-hand corner. Therefore, it is apparent that Spider Webs is currently using or at least is giving another person or entity use of the domain name.

In *Intermatic Inc.*, the court found that "[t]he fact that 'intermatic.com' will be displayed on every aspect of the web page is sufficient to show that Intermatic's mark will likely be diluted." *See* 947 F.Supp. at 1241. "Dilution of Intermatic's mark is likely to occur because the domain name appears on the web page and is included on every page that is printed from the web page." *Id.* at 1240. In this case, "Ernestandjuliogallo.com" is displayed on every page printed off of the web site accessed by that domain name by Weinlein and on the pages printed off the SpinTopic web

site when accessed by the same name. Hence, as in *Intermatic Inc.*, these facts are sufficient to show the likelihood of dilution of Gallo's mark.

"A significant purpose of a domain name is to identify the entity that owns the web site." *Panavision Int'l, L.P.*, 141 F.3d at 1327. " 'A customer who is unsure about a company's domain name will often guess that the domain name is also the company's name.' " *Id.* (quoting *Cardservice Int'l, Inc. v. McGee*, 950 F.Supp. 737, 741 (E.D.Va.), *aff'd*, 129 F.3d 1258, 1997 WL 716186 (4th Cir.1997)). The value of a trademark is diluted when the domain name does not belong to the company sharing that name because potential customers "will be discouraged if they cannot find its web page by typing '[plaintiff's name].com,' but instead are forced to wade through hundreds of web sites." *Id.* " 'Prospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page, due to anger, frustration or the belief that plaintiff's home page does not exist.' " *Id.* (quoting *Jews for Jesus v. Brodsky*, 993 F.Supp. 282, 306–07 (D.N.J.), *aff'd*, 159 F.3d 1351 (3d Cir.1998)). Moreover, " '[i]f [defendants] were allowed to use '[plaintiff's name].com,' [plaintiff's] name and reputation would be at [defendants'] mercy and could be associated with an unimaginable amount of messages on [defendants'] web page.' " *Id.* (quoting *Intermatic Inc.*, 947 F.Supp. at 1240).

The court in *Intermatic Inc.* explained that "Toeppen's registration of the intermatic.com domain name lessens the capacity of Intermatic to identify and distinguish its goods and services by means of the Internet. Intermatic is not currently free to use its mark as its domain name." 947 F.Supp. at 1240. In a similar vein, Spider Webs' ownership of the domain name ER-NESTANDJULIOGALLO.COM gives Spider Webs exclusive control over the use of Gallo's trademark "ERNEST & JULIO GALLO" on the Internet, effectively preventing Gallo from ensuring the ability of its mark to serve as a unique identifier for its goods and services. Gallo owns the mark "ERNEST & JULIO GALLO." The only differences between Gallo's mark and Spider Webs' domain name ERNES-TANDJULIOGALLO.COM are the lack of spaces between the words, the use of the word "AND" rather than an ampersand, and the inclusion of the suffix ".COM." These differences are insignificant, however. All Internet domain names must end in a top level domain name, such as ".COM," ".ORG," or ".NET." [1] *See Sporty's Farm L.L.C.*, 202 F.3d at 492; *Morrison & Foerster, LLP v. Wick*, 94 F.Supp.2d 1125, 1126 (D.Colo.2000). Moreover, as admitted by Steve Thumann at deposition, an Internet domain name cannot contain spaces between words or an ampersand symbol. Hence, Spider Webs has effectively usurped Gallo's trademark, as Gallo is not free to use its mark as its domain name.

Gallo alleges that Spider Webs' use of the "ERNESTANDJULIOGALLO.COM" web site tarnishes its trademark because the web site hosted by Spider Webs directs Gallo's customers and potential customers to a web site where Spider Webs has posted disparaging remarks about Gallo. Gallo asserts that the negative content and poor quality of the web page has

---

1. "Web pages are designated by an address called a domain name. A domain name consists of two parts: a top level domain and a secondary level domain. The top level domain is the domain name's suffix. Currently, the Internet is divided primarily into six top level domains: (1) .edu for educational institutions; (2) .org for non-governmental and non-commercial organizations; (3) .gov for governmental entities; (4) .net for networks; (5) .com for commercial users; and (6) a nation-specific domain, which is .us in the United States. The secondary level domain is the remainder of the address, and can consist of combinations of letters, numbers, and some typographical symbols. To take a simple example, in the domain name 'cnn.com,' cnn ('Cable News Network') represents the secondary level domain and .com represents the top level domain. Each domain name is unique." *Sporty's Farm L.L.C.*, 202 F.3d at 492–93.

tarnished its registered mark. Federal courts have noted that a defendant's ownership of a domain name that contains the plaintiff's registered trademark puts the plaintiff's reputation and name at the mercy and whim of the defendant. *See Panavision Int'l, L.P.,* 141 F.3d at 1327; *Jews for Jesus,* 993 F.Supp. at 307; *Intermatic Inc.,* 947 F.Supp. at 1240. The court in *Jews for Jesus* recognized that, in these situations, the trademark owner has lost control over the use of its mark. *See* 993 F.Supp. at 307. Here, Gallo has shown that it owns a distinctive mark and that there is a likelihood of dilution. Thus, Gallo is entitled to summary judgment on its claim that Spider Webs has violated the Texas Anti–Dilution Statute.

The Texas Anti–Dilution Statute provides for injunctive relief. *See* TEX. BUS. & COM. CODE ANN. § 16.29. It offers broader protection for trademarks than does federal law, allowing injunctive relief " 'regardless of whether there is competition between the parties or confusion as to the source of goods or services.' " *Service Merch. Co. v. Service Jewelry Stores, Inc.,* 737 F.Supp. 983, 993 (S.D.Tex.1990) (quoting TEX. BUS. & COM. CODE ANN. § 16.29 ); *accord Pebble Beach Co. v. Tour 18 I, Ltd.,* 155 F.3d 526, 550 (5th Cir.1998); *Pebble Beach Co.,* 942 F.Supp. at 1563–64. Gallo seeks to enjoin Spider Webs from using the Internet domain name "ERNESTANDJULIOGALLO.COM" and from registering any domain name that contains the word "Gallo" and/or the words "Ernest" and "Julio" in combination.

■ "[I]njunctive relief may only be granted upon a showing of (1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate remedy at law." *Jim Rutherford Inv., Inc. v. Terramar Beach Community Ass'n,* 25 S.W.3d 845, 849 (Tex.App.—Houston [14th Dist.] 2000, no pet.); *accord Kenneth Leventhal & Co. v. Reeves,* 978 S.W.2d 253, 259 (Tex.App.—Houston [14th Dist.] 1998, no pet.). Under Texas law, injunctive relief may be either prohibitory,

preventing conduct, or mandatory, requiring conduct. *See R.P.&R., Inc. v. Territo,* 32 S.W.3d 396, 400 (Tex.App.—Houston [14th Dist.] 2000, no pet. h.); *LeFaucheur v. Williams,* 807 S.W.2d 20, 22 (Tex.App.—Austin 1991, no writ). To obtain injunctive relief, Gallo must show that imminent, irreparable harm would arise from the failure of the court to issue an injunction. *See National Football League Props. v. Playoff Corp.,* 808 F.Supp. 1288, 1294 (N.D.Tex.1992); *Operation Rescue–Nat'l v. Planned Parenthood of Houston & Southeast Tex., Inc.,* 975 S.W.2d 546, 554 (Tex.1998); *Chandler v. Chandler,* 991 S.W.2d 367, 402 (Tex.App.—El Paso 1999, pet. denied), *cert. denied,* 529 U.S. 1054, 120 S.Ct. 1557, 146 L.Ed.2d 462 (2000). In *Jews for Jesus,* the court held that the plaintiff's loss of control of its trademark by the defendant's unauthorized use of it on the Internet and the possibility that views contrary to those of the plaintiff would be disseminated constituted proof that irreparable harm would result absent an injunction. *See* 993 F.Supp. at 311–13.

■ Here, Spider Webs' wrongful use of the web site, particularly to make disparaging remarks regarding the instant litigation and alcohol use in general, indicates the existence of imminent and irreparable harm. No remedy at law exists that would adequately protect Gallo's mark. Accordingly, Gallo's request for a permanent injunction has merit. Spider Webs shall be permanently enjoined from using the Internet domain name "ERNESTANDJULIOGALLO.COM" and from registering any domain name that contains the word "Gallo" or the words "Ernest" and "Julio" in combination. Spider Webs shall further be ordered to transfer to Gallo the domain name "ERNESTANDJULIOGALLO.COM" within ten days from the entry of the order.

### C. Anti–Cybersquatting Consumer Protection Act

■ On November 29, 1999, Congress passed the ACPA " 'to protect consumers

and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as 'cybersquatting.'"[2] *Sporty's Farm L.L.C.*, 202 F.3d at 495 (quoting S. REP. No. 106–140, at 4 (1999)). As explained by the Second Circuit:

> Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners. Since domain name registrars do not check to see whether a domain name request is related to existing trademarks, it has been simple and inexpensive for any person to register as domain names the marks of established companies. This prevents use of the domain name by the mark owners, who not infrequently have been willing to pay "ransom" in order to get "their names" back.

*Id.* at 493 (citing H.R. REP. No. 106–412, at 5–7 (1999); S. REP. No. 106–140, at 4–7 (1999)). While the ACPA was enacted after Spider Webs' August 26, 1999, registration of the domain name at issue, the Act states that it applies "to all domain names registered before, on, or after the date of enactment of this Act." 1999 ACTS, P.L. 106–113, § 3010, 113 STAT. 1536. The statute further provides, in relevant part:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
>
> (I) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that—

> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
>
> (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).

As discussed in detail above, Gallo has shown that it has a distinctive and famous trademark and that the domain name "ERNESTANDJULIOGAL-LO.COM" is nearly indistinguishable from Gallo's "ERNEST & JULIO GALLO" trademark. In *Sporty's Farm L.L.C.*, the Second Circuit held that the domain name "Sportys.com" was indistinguishable and confusingly similar to the plaintiff's trademark "Sporty's." *See* 202 F.3d at 498. The court found that the only difference between the two names, the lack of an apostrophe in the domain name, did not destroy the similarity because apostrophes are not valid characters for domain names. *See id.* at 497–98. Other federal courts have agreed that domain names that are substantially the same as a trademark are confusingly similar and create a presumption of confusion. *See People for the Ethical Treatment of Animals, Inc. v. Doughney,* 113 F.Supp.2d 915, 920 (E.D.Va.2000); *Shields v. Zuccarini,* 89 F.Supp.2d 634, 639 (E.D.Pa.2000); *OBH, Inc. v. Spotlight Magazine, Inc.,* 86 F.Supp.2d 176, 188 (W.D.N.Y.2000). In this instance, Spider Webs' domain name "ERNESTANDJU-LIOGALLO.COM" is confusingly similar to Gallo's registered trademark "ERNEST & JULIO GALLO."

---

**2.** "'Cyber' is the prefix used to denote Internet-related things. The realm of the Internet is often referred to as 'cyberspace.'" *Sporty's Farm L.L.C.,* 202 F.3d at 493 n. 5.

The ACPA lists nine factors a court may consider when determining whether a domain name was registered in bad faith:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are fa-

mous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous.

15 U.S.C. § 1125(d)(1)(B). The statute further provides, however, that "[b]ad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Id.* The court is "not limited to considering just the listed factors when making [its] determination of whether the statutory criterion has been met. The factors are, instead, expressly described as indicia that 'may' be considered along with other facts." *Sporty's Farm L.L.C.*, 202 F.3d at 498 (citing 15 U.S.C. § 1125(d)(1)(B)(i); *see Northern Light Tech., Inc. v. Northern Lights Club*, 236 F.3d 57, 64–65 (1st Cir.2001) (describing the factors as "nonexhaustive").

In *Sporty's Farm L.L.C.*, the Second Circuit, in the first appellate-level interpretation of the ACPA, ordered a cybersquatter to relinquish a domain name. *See id.* at 500. Plaintiff Sporty's Farm filed suit seeking a declaration that it had the right to continue using the domain name "Sportys.com" despite the fact that another entity held the registered trademark "Sporty's." *See id.* at 494. Sporty's Farm maintained a web site at that address for the sale of Christmas trees. *See id.* Defendant Sportsman's Market owned the registered trademark "Sporty's," which it used in connection with a catalog business selling aviation-related merchandise, tools, and home accessories. *See id.* at 493–94. The court found that Sporty's Farm had acted with a bad faith intent to profit by using the "Sportys.com" domain name. *See id.* at 499. The Second Circuit reached its conclusion, in part, because Sporty's Farm had no intellectual property interest in the domain name, the domain

name did not consist of the legal name of the party that registered it, and Sporty's Farm did not start using the web site at "Sportys.com" until the litigation began. *See id.* at 498–99.

■ In the case at bar, a review of the nine factors provides ample evidence that Spiders Webs used, registered, or trafficked in the domain name ERNESTAND-JULIOGALLO.COM with a bad faith intent to profit from the sale of the domain name. Gallo has a registered trademark in the name "ERNEST & JULIO GAL-LO," while Spider Webs has no intellectual property interest in the name "ERNES-TANDJULIOGALLO" aside from its registered domain name. Furthermore, the domain name "ERNESTANDJULIOGAL-LO.COM" does not include the legal name of Spider Webs Ltd., the company that registered the domain name, or of its partners, Steve E. Thumann, Pierce A. Thumann, and Fred H. Thumann, Trustee.

As admitted in Defendants' responses to Requests for Admission Nos. 279, 281, 283, and 285, Spider Webs has never used the domain name in connection with the *bona fide* offering of any goods or services. It has, however, used the name to develop a web site on which it has made derogatory comments about the instant litigation and about alcohol. In *Sporty's Farm L.L.C.,* the Second Circuit held that when the first use of a web site occurs after litigation is commenced, it undermines any claim that the domain name was registered in good faith. *See* 202 F.3d at 499; *Shields,* 89 F.Supp.2d at 640. Moreover, Spider Webs' use of the web site to criticize E. & J. Gallo Winery and to comment on the present litigation served only to disparage Gallo and diminish its goodwill. At deposition, Steve Thumann admitted that the domain name is valuable because of the goodwill that Gallo has developed:

Q. When Spider Webs registered ernestandjuliogallo.com—

A. Yes.

Q. —would you agree with me that ernestandjuliogallo.com is more valuable than fredandharrygallo.com?

A. Yes.

Q. Okay. And the reason for that being that Ernest & Julio Gallo is a well-known name compared to Fred and Harry Gallo. Correct?

A. Well, sure. It's a more expensive piece of property.

Q. Okay. How did the name Ernest & Julio Gallo become more well-known, more valuable than Fred and Harry Gallo?

A. Fred and Harry Gallo hadn't made wine for 50 years in the United States.

In another case involving the E. & J. Gallo Winery, a federal district court held:

When the senior user's trademark is famous in the marketplace and where the junior user was aware of the trademark and of its fame, a presumption of bad faith arises from the choice of the same name because it is inferrable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark.

*E. & J. Gallo Winery v. Gallo Cattle Co.,* 12 U.S.P.Q.2d 1657, 1675 (E.D.Cal.1989), *aff'd,* 967 F.2d 1280 (9th Cir.1992). Here, Gallo's mark is famous, and Spider Webs was aware of the trademark and its fame when it registered the domain name.

In *Doughney,* the plaintiff, which held a registered trademark in the name "PETA," standing for "People for the Ethical Treatment of Animals," sued the defendant, who had registered the domain name "PETA.ORG," purporting to connote an organization called "People Eating Tasty Animals." 113 F.Supp.2d at 917–18. The defendant posted information on its web site that was antithetical to PETA's purpose, including the description of the web site, "A resource for those who enjoy eating meat, wearing fur and leather, hunting, and the fruits of scientific research." *Id.* at 918. The court noted that "[u]ntil an internet user actually reached the 'PETA.ORG' web site, where the screen read 'People Eating Tasty Animals,'

the user had no way of knowing that the 'PETA.ORG' web site was not owned, sponsored or endorsed by PETA." *Id.* The court found the defendant in violation of the ACPA in part because "Defendant clearly intended to confuse, mislead and divert internet users into accessing his web site which contained information antithetical and therefore harmful to the goodwill represented by the PETA mark." *Id.* at 920. Similarly, in this instance, an Internet user accessing the domain name "ERNESTANDJULIOGALLO.COM" would have no way of knowing that the web site is not connected to Gallo until after reaching it, where he would encounter anti-alcohol messages, anti-corporate sentiment, and disparaging remarks about Gallo itself.

At deposition, Steve Thumann conceded that Spider Webs has acquired approximately 2000 domain names, a number of which contain famous trademarks or company names, and that it offers many of these domain names for sale on its web site, "spiderwebsltd.com." He further commented that many of Spider Webs' domain names are offered for sale for millions of dollars. While the domain name at issue currently does not appear on the list of names for sale, Steve Thumann revealed at deposition that Spider Webs acquired the ERNESTANDJULIOGALLO.COM domain name with a view to holding it as "real estate" and eventually realizing a profit from it, preferably from Gallo itself:

A. We—we—I think that we hoped that Gallo would contact us and we could assist them in some way.

Q. But you were specifically anticipating Gallo contacting Spider Webs because what you registered was ernestandjuliogallo.com. Correct?

A. Yes.

He added, however, that Spider Webs' current plan is to await a declaration that the ACPA is unconstitutional before selling the domain name.

As explained by the Second Circuit, however, the United States Senate "made clear" that the ACPA was passed, in part, to counteract plans such as Spider Webs':

"While the [Federal Trademark Dilution Act] has been useful in pursuing cybersquatters, cybersquatters have become increasingly sophisticated as the case law has developed and now take the necessary precautions to insulate themselves from liability. For example, many cybersquatters are now careful to no longer offer the domain name for sale in any manner that could implicate liability under existing trademark dilution case law. And, in cases of warehousing and trafficking in domain names, courts have sometimes declined to provide assistance to trademark holders, leaving them without adequate and effective judicial remedies."

*Sporty's Farm L.L.C.*, 202 F.3d at 495–96 (quoting S. REP. No. 106–140, at 7 (1999)). In any event, the record shows that Spider Webs has registered approximately three hundred domain names that contain either company names or famous trademarks, including the names FIRESTONE-TIRES.COM, BRIDGESTONETIRES. COM, and OREOCOOKIES.COM. The court in *Doughney* based its finding of liability in part on the fact that the defendant had "registered other internet domain names which are identical or similar to either marks or names of famous people or organizations he opposes." 113 F.Supp.2d at 920. The ACPA singles out this type of behavior as indicative of bad faith. *See* 15 U.S.C. § 1125(d)(1)(B)(VII); *Northern Light Tech.*, 236 F.3d at 64–65.

Spider Webs cannot legitimately contend that it believed or had reasonable grounds to believe that its registration and use of the domain name ERNESTAND-JULIOGALLO.COM was a fair use or was otherwise lawful. Prior to the enactment of the ACPA, a number of courts had found cybersquatting to be unlawful under both federal and state anti-dilution laws. *See Panavision Int'l, L.P.*, 141 F.3d at 1327; *Jews for Jesus*, 993 F.Supp. at 307; *Intermatic Inc.*, 947 F.Supp. at 1240.

Thus, the fact that Spider Webs registered the domain name before the ACPA took effect is not dispositive of the issue of bad faith. Moreover, at deposition, Steve Thumann admitted that Spider Webs did not seek advice from counsel prior to acquiring the domain name at issue as to whether it might be engaging in infringing conduct. Courts addressing the issue have found that such a failure supports a finding of bad faith. *See OBH, Inc.*, 86 F.Supp.2d at 189; *Consorzio del Gallo Nero*, 782 F.Supp. at 476.

Spider Webs maintains, however, that the ACPA is unconstitutional "because (A) it is overbroad and can not be fairly enforced, and (2) provides for an unlawful taking and deprivation of property." In challenging the constitutionality of a statute, Spider Webs bears the burden of proof. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Seoane v. Ortho Pharms., Inc.*, 660 F.2d 146, 151 (5th Cir. 1981). Spider Webs cites no authority for its position and, in fact, concedes that it has found none. Gallo, on the other hand, cites to numerous cases upholding the constitutionality of the ACPA and its remedies. *See Sporty's Farm L.L.C.*, 202 F.3d at 502 (application of the ACPA is not unconstitutionally retroactive because cybersquatting is a continuing wrong); *Shields*, 89 F.Supp.2d at 642 (defendant failed to show that retroactive application of the ACPA was an unconstitutional taking without due process of law in violation of the Fifth Amendment); *Caesars World, Inc. v. Caesars–Palace.Com*, 112 F.Supp.2d 502, 503–05 (E.D.Va.2000) (*in rem* jurisdiction under the ACPA does not violate due process); *see also Doughney*, 113 F.Supp.2d at 921; *OBH, Inc.*, 86 F.Supp.2d at 196–97. In line with these authorities, the court finds no basis for holding the ACPA unconstitutional.

Under these circumstances, the facts established by Gallo provide adequate evidence that Spider Webs registered "ERNESTANDJULIOGALLO.COM" with a bad faith intent to profit from its actions, in direct violation of the ACPA. Thus, summary judgment is warranted on Gallo's claims under the ACPA.

Under the ACPA, "[i]n any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C); *see Sporty's Farm L.L.C.*, 202 F.3d at 495. Moreover,

[i]n a case involving a violation of [15 U.S.C. § 1125(d)(1)] the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

15 U.S.C. § 1117(d); *see Sporty's Farm L.L.C.*, 202 F.3d at 496 n. 9. Here, Gallo seeks the transfer of the domain name to it and elects to recover an award of statutory damages. Gallo suggests that "a just award would be $100,000, which would have the effect of deterring defendants from their unlawful conduct and which would compensate Gallo for the time and trouble of having to prosecute a federal court action to have returned the domain name corresponding to its admittedly famous and valuable trademark."

Spider Webs correctly points out that the applicability provisions of the ACPA and 15 U.S.C. § 1117(a) and (d) provide that damages "shall not be available with respect to the registration, trafficking, or use of the domain name that occurs before the date of the enactment of this Act." 1999 ACTS, P.L. 106–113, § 3010, 113 STAT. 1536. While the domain name in dispute was registered before the enactment of the ACPA, Gallo argues that Spider Webs has been using or allowing the use of the domain name since at least August 15, 2000, as evidenced by the record. This activity occurred well after the November 29, 1999, enactment of the ACPA. As reflected by the language of

the ACPA and the case law interpreting it, there is no requirement, as Spider Webs urges, that the "use" be a commercial use to run afoul of the ACPA.

 The record reflects that, although Spider Webs has acted in bad faith, it did not utilize the domain name to do anything as egregious as, for example, using the web site to sell poor quality wine or to market tawdry items bearing the Gallo name. Gallo has presented no evidence that it has lost any business as a result of Spider Webs' activities. Nevertheless, Spider Webs' actions, including posting information on the web site accessible by the domain name ERNESTANDJULIOGALLO.COM regarding this litigation and the dangers of alcohol consumption, have placed Gallo at risk of losing business and of having its business reputation tarnished. " '[A] domain name mirroring a corporate name may be a valuable corporate asset, as it facilitates communication with a customer base.' " *Panavision Int'l, L.P.*, 141 F.3d at 1327 (quoting *MTV Networks v. Curry*, 867 F.Supp. 202, 203–04 n. 2 (S.D.N.Y.1994)). Accordingly, the court finds an award of statutory damages in the amount of $25,000.00 to be just.

### C. *Joint and Several Liability*

Gallo claims that Defendants Spider Webs Ltd., Steve Thumann, Pierce Thumann, and Fred Thumann, Trustee, should be held jointly and severally liable for violation of the Texas Anti–Dilution Statute and the ACPA. Generally, under Texas law, a general partnership and all of its partners are liable jointly and severally for all debts and obligations of the partnership. *See* TEX. REV. CIV. STAT. ANN. art. 6132b–3.01 & 3.04 (Vernon 2000). Spider Webs Ltd. is a Texas general partnership, and Steve and Pierce Thumann, along with Fred H. Thumann, Trustee, are its sole general partners. As a result, under Texas law, Defendants Spider Webs Ltd., Steve E. Thumann, Pierce A. Thumann, and Fred H. Thumann, Trustee, may be held jointly and severally liable to Gallo for the sum of $25,000.00.

### IV. *Conclusion*

Accordingly, Gallo's Motion for Partial Summary Judgment is GRANTED. There exist no outstanding issues of material fact as to Gallo's claims under the Texas Anti–Dilution Statute and the ACPA, and Gallo is entitled to judgment as a matter of law.

Spider Webs Ltd., Steve E. Thumann, Pierce A. Thumann, and Fred H. Thumann, Trustee, are permanently enjoined from using the Internet domain name "ERNESTANDJULIOGALLO.COM," registering any domain name that contains the word "Gallo," and registering any Internet domain name that contains the words "Ernest" and "Julio" in combination.

Spider Webs Ltd., Steve E. Thumann, Pierce A. Thumann, and Fred H. Thumann, Trustee, are further ordered to transfer to Gallo the registered domain name "ERNESTANDJULIOGALLO.COM" within ten days from the entry of this order.

Spider Webs Ltd., Steve Thumann, Pierce A. Thumann, and Fred H. Thumann, Trustee, are jointly and severally liable to Gallo in the amount of $25,000.00.