Joseph C. SHIELDS, individually and t/a The Joe Cartoon Co.,

v.

John ZUCCARINI, individually and t/a Cupcake City.

No. CIV. A. 00–494.

United States District Court, E.D. Pennsylvania.

March 22, 2000.

As Amended March 27, 2000.

Michael P. Coughlin, William J. Levant, Kaplin, Stewart, Meloff, Reiter & Stein, Blue Bell, PA, for Plaintiff.

Howard M. Neu, Pembroke Pines, FL, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

We are faced in this case with one of the first motions for a preliminary injunction under the new Anticybersquatting Consumer Protection Act ("ACPA"), Pub.L. No. 106–113 (1999) (to be codified at 15 U.S.C. § 1125(d)). We yesterday held a hearing on the motion, which defendant John Zuccarini (who also trades as Cupcake City) vigorously contested.

This memorandum will constitute our findings of fact and conclusions of law under Fed.R.Civ.P. 52(a). For the reasons that follow, we will grant the motion and enjoin Zuccarini from using his variations of the "Joe Cartoon" domain name during the pendency of this action.

*Facts*

Plaintiff Joseph Shields, a graphic artist from Alto, Michigan, creates, exhibits, and markets cartoons under the names "Joe Cartoon" and "The Joe Cartoon Co." His creations include the popular "Frog Blender", "Micro–Gerbil", and "Live and Let Dive" animations. Shields licenses his cartoons to others for display on T-shirts,

coffee mugs, and other items, many of which are sold at gift stores across the country. He has marketed his cartoons under the "Joe Cartoon" label for the past fifteen years.

On June 12, 1997, Shields registered www.joecartoon.com as his World Wide Web site and has operated it ever since. Visitors to the site can download Shields's animations and purchase Joe Cartoon merchandise. Since April, 1998, when it won "shock site of the day" from Macromedia, Joe Cartoon's Web traffic has increased exponentially, now averaging over 700,000 visits per month.

In November of 1999, Zuccarini, an Andalusia, Pennsylvania "wholesaler" of Internet domain names,[1] registered five World Wide Web variations on Shields's site: joescartoon.com, joecarton.com, joescartons.com, joescartoons.com, and cartoonjoe.com. Before Shields filed this action, Zuccarini's sites featured advertisements for other sites and credit card companies. Visitors were trapped or "mousetrapped" in the sites, unable to exit without clicking on a succession of ads. Zuccarini received between ten and twenty-five cents from the advertisers for every click. Immediately after Shields filed this suit,[2] Zuccarini changed the five sites to "political protest" pages and posted the following message on them:

> This is a page of POLITICAL PROTEST
>
> — Against the web site joecartoon.com -
>
> joecartoon.com is a web site that depicts the mutilation and killing of animals in a shockwave based cartoon format—many children are inticed to the web site, not knowing what is really there and then encouraged to join in the mutilation and killing through use of the shockwave cartoon presented to them.

---

1. "Wholesaling" refers to the practice of acquiring multiple domain names with the intent to profit from them.

2. Shields attempted to resolve this matter prior to filing, but Zuccarini refused to relinquish control over the domain names.

— Against the domain name policys of ICANN -

— Against the CyberPiracy Consumer Protection Act -

As the owner of this domain name, I am being sued by joecartoon.com for $100,-000 so he can use this domain to direct more kids to a web site that not only desensitizes children to killing animals, but makes it seem like great fun and games.

I will under no circumstances hand this domain name over to him so he can do that.

I hope that ICANN and Network Solutions will not assist him to attaining this goal.

If you support in me this—please write to ICANN and Network Solutions and tell them how you feel.

— Thank you -

Pl.'s Ex. 3.

Shields's complaint invokes the ACPA as well as federal and state unfair competition law, and seeks injunctive relief, statutory damages, and attorneys' fees. The complaint originally named Network Solutions, Inc. and the Internet Corporation for Assigned Names and Numbers as defendants, but on February 11, 2000, Shields filed a voluntary notice of dismissal with respect to these defendants.

On March 17, 2000, we denied Shields's motion for summary judgment, holding that Zuccarini had raised a material issue of fact under the ACPA. *See* March 17, 2000 Order. We also denied Shields's motion to consolidate the final trial on the merits with the preliminary injunction hearing, as Zuccarini has only recently retained counsel and has not had a full opportunity to take discovery or prepare a defense.

After affording the parties a brief time for expedited discovery, we held a hearing on the preliminary injunction motion yes-terday at which we heard testimony from the protagonists.

*The ACPA*

The ACPA, which became law on November 29, 1999, is designed to " 'protect consumers and American businesses, ... promote the growth of online commerce, and ... provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as "cybersquatting." ' " *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 495 (2d Cir.2000) (quoting S.Rep. No. 106–140, at 4). The ACPA, which amended § 43 of the Lanham Act, provides as follows: [3]

(d) Cyberpiracy Prevention.

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person-

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that-

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of title 18, United States Code, or Sec-

---

**3.** Because the ACPA is currently unavailable in the United States Code Annotated, we quote its first major subsection in full.

tion 380 of Title 36, United States Code.

(B)(i) In determining whether a person has a bad faith intent described under subparagraph (A), a court may consider factors such as, but not limited to-

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43.

(ii) Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.

(C) In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark.

(D) A person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.

(E) As used in this paragraph, the term "traffics in" refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration.

In *Bargain Bid v. Ubid*, No. CV–99–7598 (E.D.N.Y. Jan. 3, 2000), Judge Leonard Wexler granted a preliminary injunction under the ACPA against conduct similar to the actions at issue here. *See* "Federal Cybersquatter Law Survives First Test in N.Y.", *The Legal Intelligencer*, Jan. 19, 2000, at 4.

*Preliminary Injunction Standard*

■ When ruling on a motion for a preliminary injunction, we consider four factors: (1) the likelihood that plaintiff will prevail on the merits at final hearing; (2) the extent to which plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) whether the injunction would serve the public interest. *See, e.g., Pappan Enters. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 803 (3d Cir.1998); *see also Adams v. Freedom Forge Corp.,* 204 F.3d 475, 484 (3d Cir.2000) ("A court may not grant [preliminary] injunctive relief without satisfying [elements one and two above], regardless of what the equities seem to require.").

### A. Shields's Likelihood of Success on the Merits Under the ACPA

■ We must make three inquiries under the ACPA. First, we must determine whether "Joe Cartoon" is a distinctive or famous mark entitled to protection. Second, we must determine if Zuccarini's domain names are "identical or confusingly similar to" Shields's mark. Finally, we must decide if Zuccarini registered the domain names with a bad-faith intent to profit from them (and, similarly, if Zuccarini is entitled to protection under the safe harbor of § 1125(d)(1)(B)(ii)). *Cf. Sporty's Farm,* 202 F.3d at 497–99.

#### 1. "Distinctive" or "Famous"

■ Under 15 U.S.C. § 1125(d)(1)(A)(ii)(I) and (II), we must first determine if "Joe Cartoon" is a "distinctive" or "famous" mark and therefore is entitled to protection under the ACPA.

In *Sporty's Farm,* the Second Circuit applied the criteria laid out in 15 U.S.C. § 1125(c)(1) in making this determination, and we will do the same. We conclude that, for purposes of the preliminary injunction motion, "Joe Cartoon" is both distinctive and famous and therefore is entitled to protection.

The first criterion under § 1125(c) is "the degree of inherent or acquired distinctiveness of the mark." As far as we (or the parties) know, Shields runs the only "Joe Cartoon" operation in the nation and has done so for the past fifteen years. This factor suggests both the inherent and the acquired distinctiveness of the mark. Also, the name "Joe Cartoon" is, in our opinion, unique and colorful, despite the fact that "Joseph" was the ninth most popular name in America in the 1990 census.[4] *See* Ron Word, "Land of Odd Names, from Cute to Desperate," *The Star–Ledger (Newark),* Jan. 19, 1997, at 44.

The second factor under § 1125(c) is "the duration and extent of use of the mark in connection with the goods or services with which the mark is used." Shields has used "Joe Cartoon" for the past fifteen years, and joecartoon.com for the past two and a half years, in connection with his animations and the sale of products featuring his drawings. This is long enough for us to find that "Joe Cartoon" has acquired some fame in the marketplace.[5] Shields's success with his mark is also evidenced in a recent *New York Times* page one story, which quoted him and cited Joe Cartoon, *see* Andrew Pollack, "Show Business Embraces Web, But Cautiously," *The New York Times,* Nov. 9,

---

**4.** It appears that the popularity of the name "Joe" may be waning, at least in the United States. Before 1997, it consistently was one of the top ten most popular names. *See, e.g.,* " 'Michael', 'Sarah' Top Names," *Tulsa World,* Jan. 16, 1998, at 2. "Joseph" was, however, the eighth most common name in Britain for 1999. *See* Sam Greenhill, "Jack Leads the Pack as Chloë puts Zoë in the Shade," *Western Daily Press,* Dec. 22, 1999, at 3.

**5.** Shields testified that he has been using the name "Joe Cartoon" since he was a boy. His first use of "The Joe Cartoon Co." was in a birthday or Valentine's Day card he made for his mother at age fourteen. He did not begin using the name on a commercial basis, however, until several years later.

He also testified that he has spent thousands of dollars putting up and expanding his website.

1999, at A1, C6 (Pl.'s Ex. 20). This is further evidence of "Joe Cartoon'"'s fame.[6]

The third factor is "the duration and extent of advertising and publicity of the mark." Joe Cartoon t-shirts have been sold across the country since at least the early 1990's, and its products appear on the Website of at least one nationally known retail chain, Spencer Gifts. Shields has also advertised in an online humor magazine with a circulation of about 1.4 million. As the Joe Cartoon Website receives in excess of 700,000 visits per month, it has received wide publicity and advertising. According to Shields, word-of-mouth also generates considerable interest in the Joe Cartoon site.

The fourth factor is "the geographical extent of the trading area in which the mark is used." It seems beyond dispute that Shields trades nationwide in both real and virtual markets. Obviously, Joe Cartoon's site on the World Wide Web gives it a global reach.

The fifth factor is "the channels of trade for the goods and services with which the mark is used." Shields's cartoons and merchandise are marketed on the Internet, in gift shops, and at tourist venues. An Internet user searching for one of Shields's cartoons would have difficulty locating it without using the words "Joe Cartoon." As noted, "Joe Cartoon" products are distributed nationally through the Spencer Gifts Website, and the joecartoon.com site attracts almost ten million visitors per year.

The sixth factor is "the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought." In contrast to the huge following Shields has won for his Joe Cartoon site, Zuccarini's very business existence depends upon his parasitic use of others' names, ranging from Gwyneth Paltrow to Jessica Rabbit to Sony Television to *Star Wars.*

**6.** See also the reference to "a frog pulverized in a blender" in a page one story in *The Wall Street Journal. See* Michael J. McCarthy,

Finally, the seventh factor is "the nature and extent of use of the same or similar marks by third parties." As we discussed above, neither we nor the parties are aware of any other Joe Cartoon.

Thus, in light of the above, we conclude that "Joe Cartoon" is both distinctive and famous. Under the ACPA, however, a mark is protected if it is distinctive *or* famous, *see* 15 U.S.C. § 1512(d)(1)(A)(ii)(I) and (II), and "Joe Cartoon" therefore need only be one or the other to be protected.

2. *"Identical or Confusingly Similar"*

■ Our next inquiry is whether Zuccarini's domain names are "identical or confusingly similar to" Shields's mark. As the domain names are for all practical purposes identical to "joecartoon.com", and because, as discussed *infra,* Zuccarini registered them for that very reason, we easily conclude that they are "confusingly similar." *Cf. Sporty's Farm,* 202 F.3d at 497–98. Also, Shields has produced evidence of Internet users who were confused by Zuccarini's sites, bolstering our conclusion. *See, e.g.,* Pl.'s Ex. 22, at [4] (a copy of an e-mail message stating, "I tried to look up you[r] website yesterday afternoon and a protest page came up. Will I have trouble entering the site at times because of this?").

3. *"Bad Faith Intent to Profit"*

■ Our final inquiry under the ACPA is whether Zuccarini acted with a bad faith intent to profit from Shields's distinctive and famous mark. Section 1125(d)(1)(B)(i) provides a nonexhaustive list of nine factors for us to consider when making this determination, and § 1125(d)(1)(B)(ii) provides a safe harbor for Zuccarini if he can show that he reasonably believed that his use of the domain names was fair and lawful.

During his deposition and before us, Zuccarini admitted that he registered the

"Web Surfers Beware: The Company Tech may be a Secret Agent," *The Wall Street Journal,* Jan. 10, 2000, at A1, A12 (Pl.'s Ex. 21).

variations on "Joe Cartoon," as well as thousands of other domain names, *because* they are confusingly similar to others' famous marks or personal names—and thus are likely misspellings of these names—in an effort to divert Internet traffic to his sites.[7] *See* Pl.'s Ex. 12, at 42–44, 67–69. For example, he has registered obvious misspellings of celebrities' names, such as gwenythpaltrow.com, rikymartin.com, and britneyspears.com. He also has registered variations on popular product and website names, like sportillustrated.com, mountianbikes.com, and msnchatrooms.com. This conduct is compelling evidence of his bad faith. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V) and (VII).

Also, Zuccarini conducts no bona fide business and offers no goods or services that have anything to do with "Joe Cartoon" or with any of the other sites he has registered, *see* 15 U.S.C. § 1125(d)(1)(B)(i)(III).[8] He has no trademark or intellectual property rights in any form of "Joe Cartoon," *see* 15 U.S.C. § 1125(d)(1)(B)(i)(I), and "Joe Cartoon" is not even close to his personal name, *see* 15 U.S.C. § 1125(d)(1)(B)(i)(II). Finally, the mark is distinctive and famous, as discussed *supra*. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(IX).

Thus, there is overwhelming evidence that Zuccarini acted with a bad-faith intent to profit when he registered these five domain names. He claims, however, that he is entitled to protection under 15 U.S.C. § 1125(d)(1)(B)(ii), because he reasonably believed that his use was lawful and proper. He argues that his only intent was to protest the graphic and gruesome depictions of brutality to animals in Shields's cartoons.[9] We reject this argument, for several reasons.

First, Zuccarini used his "Joe Cartoon" websites for purely commercial purposes before Shields filed this action. We find it incredible that Zuccarini intended to use the domain names for political speech all along, yet only happened to get around to changing the websites' content after Shields sued him for thousands of dollars and injunctive relief in federal court.[10]

Second, the vast majority of Zuccarini's many websites are not political fora but are merely vehicles for him to make money. Indeed, most of his sites suggest that they lead to sexually explicit material, even though not all do. *See, e.g., www.victoriasecretsmodel.com.* It strains credulity to believe that he uses 99.9% of his domain names for profit but reserves his Joe Cartoon domains for fair and lawful political speech.

Third, while some may find Shields's cartoons in poor taste, they are hardly realistic and graphic. In fact, some of the images are rather cute. *See, e.g.,* the frog in "Frog Blender" or the lemmings competing for diving medals in "Live and Let Dive". In any event, this is tame stuff compared with the regular catastrophes that befall Wile E. Coyote.

We thus find it hard to believe, in light of all of the graphic, violent, and far more troubling images present in our popular culture, that Shields's cartoons so shocked and appalled Zuccarini that he was sin-

---

7. Specifically, Zuccarini testified before us that he was amazed to learn "people mistype [sought domain names] as often as they do," and thus variants on actual spellings of likely search names would result in many unintended visitors to Zuccarini's sites. Actual experience seems rather clearly to have borne out Zuccarini's analysis, as his click-based revenue now approaches $1 million per year.

8. It came as little surprise when Zuccarini admitted in response to our questions that he never bothered to get permission from, *e.g.,*

Gwyneth Paltrow or Sony Television to use their names.

9. For example, an insouciant frog in a blender goads the visitor to increase the speed, only to get his comeuppance in a whirling, violent end, apparently an *au courant* image. *See* P.T. Anderson, *Magnolia* (New Line Cinema 1999).

10. In fact, Zuccarini testified that he put up the protest pages at 3:00 in the morning of February 1, 2000, just hours after being served with Shields's complaint.

cerely compelled to launch a political protest. He admitted to us that he did not, for example, protest the frog apocalypse in *Magnolia.* He conceded that he has never before complained about animals' depictions to anyone. He has never belonged to an organization that champions animal rights. To the contrary, he maintains domain names such as *www.sexwithanimal.com* and *www.girlwithanimals.com.*

In short, we conclude that Zuccarini's claim of good faith and fair use is a spurious explanation cooked up purely for this suit, and we reject it out of hand. We therefore find that Shields is likely to prevail on the merits of his ACPA claim.[11]

### B. *Irreparable Harm to Shields If the Injunction is Not Granted*

■ In *Opticians Ass'n v. Independent Opticians,* 920 F.2d 187, 196 (3d Cir.1990), a trademark infringement case, our Court of Appeals held that a finding of irreparable injury can be based on a finding of a likelihood of confusion. Although the standard under the ACPA is "confusingly similar" rather than a "likelihood of confusion", we find that the factors the *Opticians Ass'n* court looked to—the threat of damage to the plaintiff's reputation, and the loss of trade, good will, and control over one's reputation—are relevant here.

There is a real danger that Shields will suffer damage to his reputation and a loss of good will if Zuccarini is allowed to operate his offending websites.[12] Furthermore, this sort of injury is not easily compensable after the fact, as it will be nearly impossible to discover how many Internet users did *not* visit Shields's site because of Zuccarini's domain names.[13] Also, damage to reputation is not easily quantifiable, nor is the intangible control over one's reputation.

We therefore conclude that Shields will be irreparably harmed if we do not grant the injunction. *Cf. Freedom Forge,* 204 F.3d 475, 484.

### C. *The Balance of Hardships*

Also relevant to our inquiry is any harm Zuccarini will sustain if we grant the injunction. Because content removed from the sites can be replaced with a few clicks of the mouse should Zuccarini prevail on the merits, no irreversible harm will flow from an order to cease use of the Joe Cartoon sites. Also, because Zuccarini has converted the sites to "political protest" pages from which he (presumably) derives no profit, he will not sustain any economic damage from an order to stop using them. Nor can he argue that such an order would violate his First Amendment right to free speech, as he has plenty of other outlets for his protest (*i.e.,* just one of the three thousand domain names he owns would provide a sufficient forum).

Zuccarini has failed to articulate any way in which he would be harmed if we grant the injunction.

### D. *The Public Interest*

In *Opticians Ass'n,* 920 F.2d at 197, our Court of Appeals held that, in trademark cases, "public interest ... is ... a syn-

---

11. Because of this conclusion, we need not consider whether Shields is likely to prevail on his federal and state claims for unfair competition.

12. Shields credibly testified that, as an artist, his good name is important to him, and he has worked hard to make it as well-known as it is today. He understandably does not want it associated with Zuccarini's commercial endeavors.

13. Zuccarini argues that Shields's continuing traffic growth belies injury from the offending sites. This contention misses a fundamental point. We can never know *how much* traffic was lost, or how much faster the traffic would have grown among those who, unlike the complaining e-mailers of Exhibit P–22, did not have the fortitude or time to complain about these sites. Having ourselves been "mousetrapped" in some of Zuccarini's sites in deciding Shields's summary judgment motion, we could well understand any similar victim wanting nothing further to do with Joe Cartoon once he or she at last escaped those maddening programs in Zuccarini's cognates.

onym for the right of the public not to be deceived or confused." In the instant case, Zuccarini admits that he is literally in the business of profiting on the public's confusion. He makes money with each Internet user he deceives, and his revenue stream suggests that he deceives many people. This factor confirms that Shields is entitled to injunctive relief.

*Zuccarini's Constitutional Defense*

■ At the hearing yesterday, Zuccarini argued that a retroactive application of the ACPA (*i.e.*, the application of the Act to domain names registered before its passage) is an unconstitutional taking without due process of law in violation of the Fifth Amendment. In support of this argument, he cites *Armendariz v. Penman*, 75 F.3d 1311 (9th Cir.1996), *Unity Real Estate Co. v. Hudson*, 178 F.3d 649 (3d Cir.1999), and *Good v. United States*, 189 F.3d 1355 (Fed. Cir.1999).

Zuccarini brought these cases to our attention for the first time at the close of the hearing and has failed to articulate how they are even relevant to the instant action. We are at a loss to see how they could apply to this case. *Good* involved the Government's regulation of a landowner's development of his real property. *Armendariz* was a § 1983 case based on Government sweeps of low-income housing units and the subsequent closings of public buildings. Lastly, *Unity* was a Coal Act case dealing with contributions to employee health and welfare funds by former coal mine operators.

Much more to the point is *Sporty's Farm*, 202 F.3d at 502, where the Second Circuit addressed the issue of the retroactive application of the ACPA and held that, because an injunction would provide only prospective relief—in other words, would only avoid continuing harm from use of the domain name—the new law posed no retroactivity problem. *See also Landgraf v. USI Film Prods.*, 511 U.S. 244, 273, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("[A]pplication of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening

statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive."); *Viacom, Inc. v. Ingram Enters.*, 141 F.3d 886, 889 (8th Cir.1998) (holding that trademark dilution was a continuing wrong and therefore that relief was prospective even if use of the trademark began before the enactment of the relevant statute).

Similarly, because any relief we grant will be designed to redress a wrong that continued after November 29, 1999—*i.e.*, Zuccarini's unlawful use of the infringing domain names—we at this stage reject his retroactivity argument. He has failed to convince us that he is likely to prevail on a retroactivity defense at final hearing. On this limited record and without the benefit of any briefing, we will not engage in any further analysis of the ACPA's constitutionality. We merely hold that Zuccarini has not shown that he is likely to prevail on a theory that the ACPA is unconstitutionally retroactive or countenances an unconstitutional "taking" by a nongovernmental actor.

*Conclusion*

Zuccarini has engaged in exactly the type of conduct the ACPA is designed to prevent, and Shields will suffer irreparable harm unless we enjoin this flagrant violation of his rights. We entertain no doubt that Shields is entitled to a preliminary injunction. An Order follows.

## ORDER

AND NOW, this 22nd day of March, 2000, upon consideration of plaintiff's motion for a preliminary injunction and defendant's response thereto, and after expedited discovery and a hearing this day, and for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that:

1. The motion is GRANTED;

2. Defendant John Zuccarini, individually and trading as Cupcake City, and all other persons acting in concert with him, is ENJOINED during the

pendency of this action from using or abetting the use of the domain names joescartoon.com, joecarton.com, joescartons.com, joescartoons.com, cartoonjoe.com, and any other cognate domain name (the "Infringing Domain Names");

3. The defendant shall forthwith, and at his own expense, deactivate the Infringing Domain Names, and submit evidence to this Court of such deactivations by March 31, 2000; and

4. Plaintiff shall post security in the amount of $1,000.00.