

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-15-2001

# Shields v. Zuccarini

Precedential or Non-Precedential:

Docket 00-2236

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Shields v. Zuccarini" (2001). *2001 Decisions.* Paper 131.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/131

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 15, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2236

JOSEPH C. SHIELDS, individually
and trading as THE JOE CARTOON
COMPANY

v.

JOHN ZUCCARINI, individually
and trading as CUPCAKE CITY;
NETWORK SOLUTIONS, INC.;
INTERNET CORPORATION, FOR
ASSIGNED NAMES AND NUMBERS

John Zuccarini, Individually
and trading as Cupcake City,

        Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 00-cv-00494)
District Judge: Honorable Stewart Dalzell

Argued: April 24, 2001

Before: BARRY, AMBRO and ALDISER T, Circuit Judges.

(Filed: June 15, 2001)

        Howard M. Neu (Argued)
        1152 North University Drive
        Pembroke Pines, Florida 33024

        ATTORNEY FOR APPELLANT

          Michael P. Coughlin
          William J. Levant (Argued)
          KAPLIN STEWART MELOFF
          REITER & STEIN, P.C.
          350 Sentry Parkway, Building 640
          P.O. Box 3037
          Blue Bell, Pennsylvania 19422-1240

          ATTORNEYS FOR APPELLEE

OPINION OF THE COURT

ALDISERT, Circuit Judge.

John Zuccarini appeals from the district court's grant of summary judgment and award of statutory damages and attorneys' fees in favor of Joseph Shields under the new Anticybersquatting Consumer Protection Act ("ACPA" or "Act"). In this case of first impression in this court interpreting the ACPA, we must decide whether the district court erred in determining that r egistering domain names that are intentional misspellings of distinctive or famous names constitutes unlawful conduct under the Act. W e must decide also whether the district court abused its discretion by assessing statutory damages of $10,000 per domain name. Finally, we must decide whether the court erred in awarding attorneys' fees in favor of Shields based on its determination that this case qualified as an "exceptional" case under the ACPA. W e affirm the judgment of the district court.

The district court had jurisdiction pursuant to 28 U.S.C. S 1331. This court has jurisdiction by virtue of 28 U.S.C. SS 41 and 1291.

I.

Shields, a graphic artist from Alto, Michigan, creates, exhibits and markets cartoons under the names "Joe Cartoon" and "The Joe Cartoon Co." His cr eations include the popular "Frog Blender," "Micro-Gerbil" and "Live and Let Dive" animations. Shields licenses his cartoons to

2

others for display on T-shirts, coffee mugs and other items, many of which are sold at gift stores acr oss the country. He has marketed his cartoons under the "Joe Cartoon" label for the past fifteen years.

On June 12, 1997, Shields registered the domain name joecartoon.com, and he has operated it as a web site ever since. Visitors to the site can download his animations and purchase Joe Cartoon merchandise. Since April 1998, when it won "shock site of the day" from Macr omedia, Joe Cartoon's web traffic has increased exponentially, now averaging over 700,000 visits per month.

In November 1999, Zuccarini, an Andalusia, Pennsylvania "wholesaler" of Internet domain names,[1] registered five world wide web variations on Shields's site: joescartoon.com, joecarton.com, joescartons.com, joescartoons.com and cartoonjoe.com. Zuccarini's sites featured advertisements for other sites and for credit card companies. Visitors were trapped or"mousetrapped" in the sites, which, in the jargon of the computer world, means that they were unable to exit without clicking on a succession of advertisements. Zuccarini received between ten and twenty-five cents from the advertisers for every click.

In December 1999, Shields sent "cease and desist" letters to Zuccarini regarding the infringing domain names. Zuccarini did not respond to the letters. Immediately after Shields filed this suit, Zuccarini changed thefive sites to "political protest" pages and posted the following message on them:

> This is a page of POLITICAL PROTEST
>
> – Against the web site joecartoon.com –
>
> joecartoon.com is a web site that depicts the mutilation and killing of animals in a shockwave based cartoon format –– many children are inticed [sic] to the web site, not knowing what is really there and then encouraged to join in the mutilation and killing

_____

1. "Wholesaling" refers to the practice of acquiring multiple domain names with the intent to profit from them.

through use of the shockwave cartoon pr esented to them.

– Against the domain name policys [sic] of ICANN –

– Against the Cyberpiracy Consumer Protection Act –

As the owner of this domain name, I am being sued by joecartoon.com for $100,000 so he can use this domain to direct more kids to a web site that not only desensitizes children to killing animals, but makes it seem like great fun and games.

I will under no circumstances hand this domain name over to him so he can do that.

I hope that ICANN and Network Solutions will not assist him to attaining this goal.

–Thank You–

Shields v. Zuccarini, 89 F. Supp. 2d 634, 635–636 (E.D. Pa. 2000).

Shields's Complaint invoked the ACPA as well as federal and state unfair competition law and sought injunctive relief, statutory damages and attorneys' fees. The Complaint originally named Network Solutions, Inc. and the Internet Corporation for Assigned Names and Numbers as defendants, but on February 11, 2000, Shields filed a voluntary notice of dismissal with respect to these defendants.

On March 17, 2000, the district court denied Shields's Motion for Summary Judgment,2 holding that Zuccarini

_____

2. With respect to Shields's Motion for Summary Judgment on the ACPA claim, the district court noted the following:

    (k) While this [Zuccarini's admission that he registered variations of "joecartoon.com" because they were confusingly similar] would seem to be clear evidence of Zuccarini's bad faith, he claims in his response to the motion for summary judgment that his use of the variations was fair and lawful, and that he is using the domain names `for the purpose of exercising his First Amendment rights of protest against the Plaintiff 's domain which has objectionable and offensive material.'

4

had raised a material issue of fact under the ACP A. After affording the parties a brief time for expedited discovery, the court held a hearing on Shields's request for injunctive relief. On March 22, 2000, the court enter ed a preliminary injunction in favor of Shields, which requir ed Zuccarini to transfer the infringing domain names to Shields and to refrain from "using or abetting the use of " the infringing domain names or any other domain names substantially similar to Shields's marks.

On May 2, 2000, Shields filed a Renewed Motion for Summary Judgment. Zuccarini filed no response. On June 5, 2000, the court entered an Order granting summary judgment in favor of Shields, holding that Zuccarini had registered five variations of Shields's name willfully, in bad faith, and in violation of the Act. On June 16, 2000, Shields filed a Motion for Attorneys' Fees and Costs pursuant to 15 U.S.C. S 1117(a). Zuccarini opposed the Motion contending that his conduct did not rise to the level of exceptional circumstances and that the injunction pr ovided Shields with adequate relief.

On July 18, 2000, the district court entered an Order and Judgment awarding statutory damages in the amount of $10,000 for each infringing domain name and attor neys' fees and costs in the amount of $39,109.46. Zuccarini filed a timely Notice of Appeal on July 26, 2000.

II.

We conduct plenary review of a grant of summary judgment, applying the same standard as the district court. Watson v. Eastman Kodak Co., 235 F .3d 851, 854 (3d Cir. 2000). "Summary judgment is properly granted if `the pleadings, depositions, answers to interrogatories, and

_____

  (1) We find that Zuccarini's claim of fair use creates a genuine issue of material fact precluding summary judgment at this point, particularly since he only recently retained counsel and had not yet had a full opportunity to take discovery or formulate his defense.

App. at 249 (emphasis added) (internal citations omitted).

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Celotex Corp. v. Catrett , 477 U.S. 317, 323 (1986) (quoting Rule 56(c), Federal Rules of Civil Pr ocedure). If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the bur den shifts to the non-moving party to set forth specific facts showing the existence of such an issue for trial. Rule 56(e), Federal Rules of Civil Procedure. In reviewing the district court's grant of summary judgment, we must view the evidence in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). We review a trial court's award of statutory damages for abuse of discretion. Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc., 166 F.3d 65, 74 (2d Cir. 1999). Our review of the scope and the meaning of the ter m "exceptional," as used in 15 U.S.C. S 1117(a), is plenary. Securacomm Consulting, Inc. v. Securacom, Inc., 224 F.3d 273, 279 (3d Cir. 2000).

III.

On November 29, 1999, the ACPA became law, making it illegal for a person to register or to use with the "bad faith" intent to profit from an Internet domain name that is "identical or confusingly similar" to the distinctive or famous trademark or Internet domain name of another person or company. See 15 U.S.C. S 1125(d) (Supp. 2000). The Act was intended to prevent "cybersquatting," an expression that has come to mean the bad faith, abusive registration and use of the distinctive trademarks of others as Internet domain names, with the intent to profit from the goodwill associated with those trademarks. See S. Rep. No. 106-140 (1999), 1999 WL 594571, at *11-18. Under the ACPA, successful plaintiffs may r ecover statutory damages in an amount to be assessed by the district court in its discretion, from $1,000 to $100,000 per domain name. See 15 U.S.C. S 1117(d) (Supp. 2000). In addition, successful plaintiffs may recover attorneys' fees in "exceptional" cases. See id. at S 1117(a).

In Shields's Renewed Motion for Summary Judgment for relief under the Act, he asked the district court to (1) permanently enjoin Zuccarini from using the infringing domain names and any other domain names substantially similar thereto; (2) direct Zuccarini to transfer the infringing domain names to Shields; and (3) awar d attorneys' fees and statutory damages under 15 U.S.C. S 1117(a) and (d), respectively.

In deciding whether to grant a permanent injunction, the district court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest. See ACLU v. Black Horse Pike Reg'l Bd. of Educ., 84 F .3d 1471, 1477 nn. 2-3 (3d Cir. 1996).

A.

To succeed on his ACPA claim, Shields was required to prove that (1) "Joe Cartoon" is a distinctive or famous mark entitled to protection; (2) Zuccarini's domain names are "identical or confusingly similar to" Shields's mark; and (3) Zuccarini registered the domain names with the bad faith intent to profit from them. See 15 U.S.C. S 1125 (d)(1)(A); cf. Sporty's Farm L.L.C. v. Sportsman's Market Inc., 202 F.3d 489, 497-499 (2d Cir. 2000).3

_____

3. Section 1125(d)(1)(A) of the Act provides in relevant part:

>      A person shall be liable in a civil action by the owner of a mark . . .
>      if, without regard to the goods or services of the parties, that person
>
>      (i)  has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
>      (ii) registers, traffics in, or uses a domain name that --
>
>        (I)  in the case of a mark that is dist inctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
>        (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark.

1.

Under S 1125(d)(1)(A)(ii)(I) and (II), the district court first had to determine if "Joe Cartoon" is a "distinctive" or "famous" mark and, therefore, is entitled to protection under the Act. The following factors may be consider ed when making this inquiry:

> (A) the degree of inherent or acquir ed distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degr ee of recognition of the mark in the trading ar eas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties.

15 U.S.C. S 1125(c)(1).

Shields runs the only "Joe Cartoon" operation in the nation and has done so for the past fifteen years. This suggests both the inherent and acquired distinctiveness of the "Joe Cartoon" name. In addition to using the "Joe Cartoon" name for fifteen years, Shields has used the domain name joecartoon.com as a web site since June 1997 to display his animations and sell products featuring his drawings. The longevity of his use suggests that "Joe Cartoon" has acquired some fame in the marketplace. The New York Times ran a page one story that quoted Shields and cited Joe Cartoon. See Andrew Pollack, Show Business Embraces the Web, But Cautiously, N.Y . Times, Nov. 9, 1999, at A1.

Joe Cartoon T-shirts have been sold acr oss the country since at least the early 1990s, and its products appear on the web site of at least one nationally known r etail chain, Spencer Gifts. Shields has advertised in an online humor magazine with a circulation of about 1.4 million. The Joe Cartoon web site receives in excess of 700,000 visits per month, bringing it wide publicity. According to Shields,

8

word-of-mouth also generates considerable inter est in the Joe Cartoon site. Shields trades nationwide in both real and virtual markets. The web site gives Joe Cartoon a global reach. Shields's cartoons and mer chandise are marketed on the Internet, in gift shops and at tourist venues. The Joe Cartoon mark has won a huge following because of the work of Shields. In light of the above, we conclude that "Joe Cartoon" is distinctive, and, with 700,000 hits a month, the web site "joecartoon.com" qualifies as being famous. Therefore, the trademark and domain name are protected under the ACP A.

2.

Under the Act, the next inquiry is whether Zuccarini's domain names are "identical or confusingly similar" to Shields's mark. The domain names --joescartoon.com, joecarton.com, joescartons.com, joescartoons.com and cartoonjoe.com -- closely resemble "joecartoon.com," with a few additional or deleted letters, or, in the last domain name, by rearranging the order of the wor ds. To divert Internet traffic to his sites, Zuccarini admits that he registers domain names, including the five at issue here, because they are likely misspellings of famous marks or personal names.4 The strong similarity between these domain names and joecartoon.com persuades us that they are "confusingly similar." Shields also produced evidence of Internet users who were actually confused by Zuccarini's sites. See, e.g., Pltf 's Exh. 22, at [4] (copy of an email stating, "I tried to look up you[r] website yesterday afternoon and a protest page came up. W ill I have trouble entering the site at times because of this?").

On appeal, Zuccarini argues that registering domain names that are intentional misspellings of distinctive or famous names (or "typosquatting," his ter m for this kind of conduct) is not actionable under the ACPA. Zuccarini contends that the Act is intended to prevent

---

4. Zuccarini testified that he was amazed to learn that "people mistype [domain names] as often as they do," and thus variants on likely search names would result in many unintended visitors to his sites. Shields, 89 F. Supp. 2d at 640.

"cybersquatting," which he defines as r egistering someone's famous name and trying to sell the domain name to them or registering it to prevent the famous person from using it themselves. This argument ignores the plain language of the statute and its stated purpose as discussed in the legislative history.

The statute covers the registration of domain names that are "identical" to distinctive or famous marks, but it also covers domain names that are "confusingly similar" to distinctive or famous marks. See 15 U.S.C. S 1125(d)(1)(A)(ii)(I), (II). A reasonable interpretation of conduct covered by the phrase "confusingly similar" is the intentional registration of domain names that are misspellings of distinctive or famous names, causing an Internet user who makes a slight spelling or typing error to reach an unintended site. The ACPA's legislative history contemplates such situations:

> [C]ybersquatters often register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, many of which ar e pornography sites that derive advertising r evenue based on the number of visits, or "hits," the site receives. For example, the Committee was infor med of a parent whose child mistakenly typed in the domain name for `dosney.com,' expecting to access the family-oriented content of the Walt Disney home page, only to end up staring at a screen of hardcor e pornography because a cybersquatter had registered that domain name in anticipation that consumers would make that exact mistake.

S. REP. NO. 106-140 (1999), 1999 WL 594571, at *15 (emphasis added).

Although Zuccarini's sites did not involve por nography, his intent was the same as that mentioned in the legislative history above -- to register a domain name in anticipation that consumers would make a mistake, thereby increasing the number of hits his site would receive, and, consequently, the number of advertising dollars he would gain. We conclude that Zuccarini's conduct here is a classic

10

example of a specific practice the ACPA was designed to prohibit. The district court properly found that the domain names he registered were "confusingly similar."

3.

The final inquiry under the ACPA is whether Zuccarini acted with a bad faith intent to profit fr om Shields's distinctive and famous mark or whether his conduct falls under the safe harbor provision of the Act. Section 1125(d)(1)(B)(i) provides a non-exhaustive list of nine factors for us to consider when making this deter mination:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill r epresented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by cr eating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide of fering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failur e to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that ar e

11

distinctive at the time of registration of such domain names, or dilutive of famous marks of others that ar e famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

Zuccarini's conduct satisfies a number of these factors. Zuccarini has never used the infringing domain names as trademarks or service marks; thus, he has no intellectual property rights in these domain names. See id. at (B)(i)(I). The domain names do not contain any variation of the legal name of Zuccarini, nor any other name commonly used to identify him. See id. at (B)(i)(II). Zuccarini has never used the infringing domain names in connection with the bona fide offering of goods or services. See id. at (B)(i)(III). He does not use these domain names for a non-commer cial or "fair use" purpose. See id. at (B)(i)(IV). He deliberately maintains these domain names to divert consumers fr om Shields's web site. In so doing, he harms the goodwill associated with the mark. He does this either for commercial gain, or with the intent to tar nish or disparage Shields's mark by creating a likelihood of confusion. See id. at (B)(i)(V). He has knowingly register ed thousands of Internet domain names that are identical to, or confusingly similar to, the distinctive marks of others, without the permission of the mark holders to do so.5 See id. at

_____

5. During his deposition and at the preliminary injunction hearing, Zuccarini admitted that he registered the variations of "Joe Cartoon," as well as thousands of other domain names, because they are confusingly similar to others' famous marks or personal names-- and thus are likely misspellings of these names -- in an effort to divert Internet traffic to his
sites. He has registered obvious misspellings of celebrities' names, such as gwenythpaltrow.com, rikymartin.com, and britineyspears.com. He has also registered variations on popular pr oduct and web site names, like sportillustrated.com, mountianbikes.com, and msnchatrooms.com. Although we do not determine whether Zuccarini's conduct in each of these other cases is itself a violation of the Act, nonetheless his pattern
of behavior is consistent with a bad faith intent to profit. See Northern Light Tech., Inc. v. Northern Lights Club, 236 F.3d 57, 65 (1st Cir. 2001).

12

(B)(i)(VIII). We have already established that Shields's mark is distinctive and famous. See id. at (B)(i)(IX).

Zuccarini argues that his web sites wer e protected by the First Amendment because he was using them as self-described "protest pages." Therefor e, he contends, his use falls under the safe harbor provision of S 1125(d)(1)(B)(ii), which states that "[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." The district court rejected this argument based on its conclusion that Zuccarini's claim of good faith and fair use was a "spurious explanation cooked up pur ely for this suit." Shields, 85 F. Supp. 2d at 640. W e agree.

Zuccarini used his "Joe Cartoon" web sites for purely commercial purposes before Shields filed this action. Zuccarini was on notice that his use of the domain names was considered unlawful when he received the cease and desist letters from Shields in December 1999. Zuccarini continued to use the infringing domain names for commercial purposes until Shields filed this lawsuit. Zuccarini testified that he put up the protest pages at 3:00 a.m. on February 1, 2000, just hours after being served with Shields's Complaint. Thus, by his own admission, Zuccarini submits that his alleged "fair use" of the offending domain names for "political pr otest" began only after Shields brought this action alleging a violation of the ACPA. We are aware of no authority providing that a defendant's "fair use" of a distinctive or famous mark only after the filing of a complaint alleging infringement can absolve that defendant of liability for his earlier unlawful activities. Indeed, were there such authority we think it would be contrary to the orderly enforcement of the trademark and copyright laws.

We conclude that the district court pr operly rejected Zuccarini's argument that his web sites wer e protected under the safe harbor provision. There was sufficient evidence for the district court to find that Zuccarini acted with a bad faith intent to profit when he r egistered and used the five domain names at issue here.

13

B.

The district court correctly concluded that there is a substantial likelihood of confusion, as well as actual evidence of confusion, between Zuccarini's infringing domain names and the "Joe Cartoon" mark. In Opticians Ass'n v. Indep. Opticians, 920 F.2d 187, 196 (3d Cir. 1990), a trademark infringement case, we held that a finding of irreparable injury can be based on a finding of a likelihood of confusion. The district court determined that Shields will suffer damage to his reputation and a loss of goodwill if Zuccarini is allowed to operate his offending web sites. Shields's livelihood and fame depend, in large part, on Internet users being able to access his sites, and he does not want his audience trapped in Zuccarini's sites or put off by images displayed thereon which they may attribute to him. The district court properly determined that Shields would be irreparably harmed if the court did not grant the permanent injunction.

Zuccarini testified that he has more than three thousand web sites and earns between $800,000 and $1,000,000 a year from their use. The court determined that any economic harm from the loss of the five infringing domain names would be trivial. In Opticians Ass'n, 920 F.2d at 197, this court held that, in trademark cases, "public interest . . . is a synonym for the right of the public not to be deceived or confused." Zuccarini admitted that he is in the business of profiting from the public's confusion and that he does, in fact, profit from this confusion. The district court properly concluded that this injunction would be in the public interest.

The district court did not err in determining that the elements for granting a permanent injunction set forth in ACLU v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 nn. 2-3 (3d Cir. 1996) were satisfied, thereby entitling Shields to a permanent injunction and summary judgment on his ACPA claim.

IV.

The Act provides for statutory damages for a violation of S 1125(d)(1) "in the amount of not less than $1,000 and not

14

more than $100,000 per domain name, as the court considers just." 15 U.S.C. S 1117(d). Zuccarini argues that S 1117(d) does not apply to him because he registered the offending domain names before the ACPA became law. The district court held that Zuccarini's continued use of the domain names after November 29, 1999 subjects him to the statute's proscriptions and remedies. We agree with the teachings of Virtual Works, Inc. v. Volkswagen of America, Inc., 238 F.3d 264, 268 (4th Cir. 2001) ("A person who unlawfully registers, traffics in, or uses a domain name after the ACPA's date of enactment, November 29, 1999, can be liable for monetary damages . . . .") (emphasis added); and E. & J. Gallo Winery v. Spider Webs Ltd., 129 F. Supp. 2d 1033, 1047–1048 (S.D. Tex. 2001) (holding that defendant who registered domain name in bad faith could be held liable for statutory damages even though registration was prior to enactment of the ACPA when defendant continued to use web site after the enactment of the Act).

In the alternative, Zuccarini argues that he only used the web site for sixty days after the passage of the ACPA and prior to this lawsuit being filed. He implies that, because he only used the web site for a short period of time, the district court's assessment of statutory damages was punitive in nature. Under the statute, the court has the discretion to award statutory damages that it "considers just" within a range from $1,000 to $100,000 per infringing domain name. See 15 U.S.C. S 1117(d). There is nothing in the statute that requires that the court consider the duration of the infringement when calculating statutory damages. We conclude that the district court properly exercised its discretion in awarding $10,000 for each infringing domain name.

V.

The ACPA provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. S 1117(a). In trademark infringement cases, this court has held that "a district court must make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice or knowing

15

infringement before a case qualifies as `exceptional.' " Ferrero U.S.A., Inc. v. Ozak T rading, Inc., 952 F.2d 44, 47 (3d Cir. 1991). The district court found that Zuccarini acted willfully and in bad faith when he register ed the "Joe Cartoon" domain names in an effort to confuse people and to divert Internet traffic to his web sites for his own economic gain. The court found that Zuccarini conducted no bona fide business related to Joe Cartoon and that he had no basis on which to believe his use of the domain names was fair and lawful.

Although the term "bad faith" is written into S 1125(d)(1)(A)(i) such that it is a thr eshold finding for any violation of the ACPA, we are persuaded that the district court made a proper finding that, under the circumstances, this case qualified as "exceptional" and merited the award of attorneys' fees under S 1117(a). 6 The record indicates that Zuccarini's conduct was particularly flagrant 7 and that he showed no remorse for his actions. The court stated that "based on the egregiousness of Zuccarini's conduct and his lack of contrition, we without hesitation hold that this is an `exceptional' case and that Shields was entitled to an award of attorneys' fees." App. at A25. The court's interpretation of what constitutes an "exceptional" case under the ACPA is proper.

We have considered all contentions pr esented by the parties and conclude that no further discussion is necessary.

The judgment and the award of statutory damages and attorneys' fees will be affirmed.

_____

6. In determining that this case is "exceptional" under S 1117(a), we do so without deciding whether the finding of "bad faith" under S 1125(d)(1)(A)(i) automatically warrants an award of attorneys' fees under S 1117(a) and the case law that has interpreted that provision. See Ferrero U.S.A., Inc., 952 F .2d at 47.

7. Between the issuance of the March 22, 2000 preliminary injunction, through the date of the determination that he violated the ACPA, and up until the date of the hearing to determine statutory damages and attorneys' fees and costs, Zuccarini r egistered an additional 1,644 domain names that were common misspellings of other famous companies' and/or celebrities' names.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

17